### CHARLES B. FORD *vs.* FITCHBURG RAILROAD COMPANY.

One employed by a railroad corporation to drive a locomotive engine over its road may recover damages against the corporation for personal injuries caused by a defect in the engine, which was due to the neglect of the agents of the corporation charged with keeping the engine in proper repair, although the directors and superintendent had no reason to suspect negligence or incompetence on the part of such agents.

One employed by a railroad corporation to drive a locomotive engine over its road is not debarred from recovering damages against the corporation for injuries from an explosion caused by a defect in the boiler of the engine, by the fact that he was acting in intentional violation of the rules of the company, unless the accident was due, in whole or in part, to such violation; nor by the fact that such rules provided that the driver of an engine should be held responsible for the condition of his engine, must be sure that it was in good working order, and must immediately stop, draw his fire, station his signal men

and procure assistance, whenever any defect was detected in an engine that would make it in his judgment unsafe to proceed; nor by the fact that he knew the engine was not in good working order, if he did not know and ought not to have known that 't was unsafe.

TORT to recover for personal injuries occasioned by the explosion of the boiler of a locomotive engine belonging to the defendants. Trial in the Superior Court, before *Scudder*, J.

The plaintiff testified as follows: " I was in the employ of the defendants as fireman from 1862 till 1866, and as engineer from 1866 till the accident. I ran on the engine Wachusett, on the freight train between Boston and Fitchburg. On Friday, March 25, 1870, by direction of George A. Cooledge, master mechanic of the road, the Wachusett was taken in for repairs. Frank Maddox, foreman of the round-house, who had charge of engines and attended to dispatching them in the absence of Cooledge, told me that Cooledge wished me to take the engine Concord that night. I took the engine and ran her that night to Fitchburg. The throttle-lever stem was out of order. It was hard to pull it open and to shut it off. I discovered this when I first took the engine. It grew worse until I could not shut off steam with it. I had to use the reverse lever, which is not the usual way. I noticed no other trouble that night. I ran the same engine on Saturday. My attention was called to the throttle, in the round-house of the Vermont and Massachusetts Railroad at Fitchburg, by James Day, engineer, and David T. Davis, master mechanic of the Vermont and Massachusetts Railroad. They were on the engine on Saturday morning, examining the boiler head. They took a hammer and pounded the stay-rods on the outside. I did not run her down to Boston that day. At the request of Cooledge, I went down on the passenger train, to let him know what repairs were necessary on the Wachusett. The same morning I noticed a bulging on the back head about the throttle-stem on the Concord. On reaching Boston, I told Cooledge the throttle of the Concord worked hard; that I had great difficulty in shutting it off; and that it ought to be attended to, it worked so hard. He asked what the trouble was. I told him I thought some of her long stay-rods were broken; that I had noticed a bulging

out of the back head; and that it came from some of the stay-rods being broken. He said the throttle had always worked hard. I told him it had not always worked as hard. He said that the bulging in the back head had been there a number of years; that he did not think any of the long stay-rods broken; and that I was the first one who had found any fault. I told him she was not a fit engine to run on that train; that I had a heavy train, and that the night before I was two hours late in getting into Fitchburg. He told me I must have my trains made lighter; that he had no other engine at that time which he could put on that train; and that he would arrange the first of the next week for me to come into the shop and work on my own engine. I noticed the difference in the riding of the Concord and Wachusett. There was no further change in the Concord, except that the throttle worked harder. I ran the Concord to Fitchburg Saturday. I had to handle her with the reverse lever. I had a heavy train Tuesday night; the rails were slippery; and I used my sand up before reaching Fitchburg. About a half-mile below Fitchburg she began to slip. I tried to shut off the throttle, the fireman helping me. I told him it would break the stem. I put the fire out, and finally started a wood fire, and drew the train in, in parts. I put the engine into the round-house of the Vermont and Massachusetts Railroad, where it was kept when at Fitchburg. On Wednesday morning, early, I took the dome cover off the Concord, to see what the trouble was. I went into the Vermont and Massachusetts Railroad shop, to see Davis. He sent me to Lucius P. Barnes, foreman of the repair shop, who gave me Addisor Robbins, a machinist. We took the dome cover off; found no trouble. The end of the throttle-lever struck on the boiler head. Robbins unscrewed the stem, and the lever did not then hit the boiler head. We examined the stay-rods with a long iron hook, and tried the upper ones, one on the right hand side, the other on the left; our opinion was that both were broken; we felt sure the left one was; we called in Barnes and Davis. It was their opinion they were broken; the one on the left surely broken. I ran her to Boston Wednesday. At Groton I sent a telegram to Cooledge that one long stay-rod of the Concord was broken. I

ran her in and left her at the coal shed ; went to the round-house for another engine ; and saw Maddox, but not Cooledge. Maddox said he had no orders to get another engine ready for me. I asked if he had not received the dispatch. He said he had. I went to the shop to see Edward Tourtellotte, foreman of the repair shop. I ran the Concord into the round-house. Maddox got on the engine and wanted me to show which stay-rod was broken. I took the hammer and rapped on the heads of the six stay-rods, and showed the two I thought broken. He said it was hard to tell whether they were broken or not. I told him we had the dome cover off at Fitchburg, and thought two or three of the long stay-rods were broken. I told him I did not want to run the old trap any longer any way. Nothing more was said. At this time there were freight engines unemployed about the round-house, fit to run. I ran the Concord to Fitchburg that night ; no change in her, the throttle working hard. On the road, the right hand pump broke, and I ran her up with the left hand pump. On Thursday morning I took off the castings of the broken pump, and sent them down to Cooledge. I ran her down to Boston on Thursday. On that day I talked with Cooledge about the pump. He said I should find it for my benefit to look over my engine at both ends of the road. I told him I did, but did not think it necessary to examine every bolt. I ran her up to Fitchburg that night with one pump ; no apparent change in her condition. There were three or four spare engines in. On Friday morning, April 1, when I was about to start, the engine exploded."

Cross-examination : " There were thirty-two engines on the Fitchburg Railroad. I had run on nearly all as fireman. Some were bought new, and some they built. I intended to become an engineer when I went into the employ of the road. I did not work in the shop before I was engineer. I saw engines taken apart ; I thought it necessary to understand engines well, and did so. I knew Cooledge while I was a fireman. He became master mechanic just before I became engineer, and remained so till the injury. He appointed me engineer. He had charge of the motive power, general supervision of repair, and dispatching of en-

gines. Before the accident, I never said anything against Cooledge. It never occurred to me that he was not a suitable man for the place. I had known the Concord ever since I had been on the road. She had been in the shop for repairs two or three times. She had been a spare engine; but before I took her, she had run a number of months on a freight train. I made no objection to the Concord when I took her. I never heard any one object to running her. On Saturday morning I thought the stay-rods were broken. She had an old-fashioned valve. The Wachusett had a balance valve, which works much easier. I noticed the throttle worked harder on Monday, and worked so continually; it worked about the same on the day of the explosion. I did not think the engine was in good working order. From Friday, when I took her, up to the time of the explosion, the engine was not in good working order. I thought her safe on Saturday; I thought the stay-rods were broken, but considered her safe. If not more than one rod was broken, I should consider her safe. On Wednesday morning I tried two of the stay-rods. I could not see them, because they were under water. I thought them broken, because when I took hold of them with the hook they seemed slack. After Wednesday's examination, I thought the stay-rod was broken. I did not consider her unsafe. I did not tell Maddox, who examined the boiler at Fitchburg. I said nothing to Cooledge about it on Thursday. I worked as engineer under certain rules, established by the defendants, and was bound to run by them. They were a part of my contract with the defendants. Prior to March 25, I had read them carefully and knew them. I knew Rules 1, 28 and 42.* I took the engine for

---

* Of these rules, which were put in evidence, the following are the only ones that are material:

" 1. *Right of Road.* Whenever there is the slightest doubt as to the right to the road, or to the safety of proceeding, the prudent course must invariably be adopted; and signals must be exhibited in each direction, when necessary, at a sufficient distance to guard against even the possibility of danger."

" 27. *Accidents on the Road.* In case of accident, or when a train is unable to proceed at the required rate of speed, or is delayed or stopped from any cause, excepting only the regular stops made on time at stations, a man, provided with suitable instructions and signals, must immediately and always be

a week when I was sure it was not in good working order. I considered it a part of my duty to know when it was safe to proceed with an engine when out on the road. It was my duty to know whether that engine was safe on the day of the explosion. I never drew my fire nor stopped because I thought the Concord unsafe. I did not consider her unsafe, though I had no doubt the stay-rod was broken. Stay-rods are to strengthen the boiler head and flue-sheet, which they connect. They have a tendency to strengthen the whole boiler. If there was a crack along the side of the boiler, I think that was the sole cause of the explosion. I did not go to have my trains lightened. The accident to the pump was occasioned by a nut giving way. It was the engineer's

sent out in one or both directions, as may be necessary, to stop any trains which may be approaching. This must always be done (whether any train is known to be approaching or otherwise) at all times and in all places, however brief the stoppage or detention ; and such signal men must be kept out until it is perfectly safe to recall them. Both conductors and enginemen will be held responsible for the strict observance of this regulation. In sending for assistance, it must be stated explicitly what is needed, and the nature of the accident.

" 28. Whenever the nature of the accident or detention is such that the train may be delayed a considerable time, additional men must be immediately sent to the nearest station, in one or both directions, as may be necessary, to stop all approaching trains, and immediate notice given, by telegraph or otherwise, to the master mechanic and superintendent. Whenever any defect is detected in a locomotive that would make it, in the judgment of the engineer in charge, unsafe to proceed, he will immediately draw his fire, station his signal men, and then procure assistance from the nearest possible point, by telegraph or otherwise; at the same time, as early as practicable, inform the master mechanic thereof."

" 42. *Steam Pressure.* Enginemen are held responsible for the condition of their engines, and must be sure that they are in good working order before they are taken from the engine-house. They must know that their engines are supplied with requisite fuel and water; tools, including iron bar, jacks, saw, hatchet, chain, rope, duplicate spring hangers, bolts, nuts, keys, &c.; also with red flags, red lanterns, and also with torpedoes suitably protected from the weather; and in all cases of danger they will freely use the torpedoes, in addition to the other signals, but must not in any event trust to them entirely. Hereafter no engineman must, without the consent of the master mechanic, use a steam pressure of more than one hundred and twenty pounds, and will be upon duty upon his engine when the same is in motion."

duty to see to the nut. I think the engine would be unsafe to a certain degree if two stay-rods were broken, unsafe to proceed. I considered it my duty then to know whether the engine was unsafe, by reason of a long stay-rod being broken. I considered myself a competent engineer, and was employed as such."

Reëxamination: " I never knowingly violated a rule of the company."

Recross-examination : " I knew that the Concord was not in good running order."

Jacob W. Lakin testified as follows: " I have been a boiler-maker by trade twenty-two years. I saw the wreck of the Concord after the explosion; I saw an old crack, running from the wagon-top sheet to the side sheet, two and a half feet on the inside, on the under side of the sheet, that is, just below the line ; the crack was corroded over ; I could not say how long it had been there. There were two or three old cracks inside in the back head. Some of the short stay-bolts that fasten the fire-box and side sheet together were broken off and corroded, and the sheet was corroded about the bolts. The old cracks and broken stay-bolts would be a sufficient cause for the explosion. A bulge in the back head would indicate that long stay-rods were broken. I do not consider it safe to run an engine with one or more stay-rods broken, or if stay-bolts are broken. There would have been no difficulty after proper examination in discovering these defects. I would take off the dome cover, take out the valve throttle, one long stay-rod on either side, then go inside, lie down and look. _ used to see the Concord the year before the explosion, in the engine-house at Fitchburg. I could see water and steam ooze out on the left hand side below the rivets. It was two years ago that I saw steam oozing out a great many times." Cross-examination : " The crack was in the lower sheet, where it begins to bend, right at the lower edge. The rest of the break on the wagon-top sheet was new. The sole cause of the explosion was the side crack. The line of explosion did not follow the cracks in the back head. The side sheet below the line of explosion was but a little sprung. It bent out above the first line of stay-bolts, and just below the old crack." Reëxamination : " A bulge in a boiler

head would indicate such a weakness in other parts as to render necessary an examination of the whole boiler."

Addison Robbins testified as follows : " I examined the Concord on the Wednesday before she blew up. Bulging in the back head had thrown out the lever, and lengthening the stem relieved the throttle. Over the whole boiler, down to the running board, there was a layer of wood lagging, and a sheet iron cover, fastened over the lagging with brass bands. The crack would not show through without taking off the lagging. I saw stay-bolts, but the side sheet was substantially in its place. The crack in the side sheet was a sufficient cause for the explosion."

David T. Davis testified as follows : " I am master mechanic of the Vermont and Massachusetts Railroad. The duties of a master mechanic are to have charge of the motive power and see that engines are fit to run, and have charge of artisans employed in the construction and repairs of engines. It is necessary that he should be a mechanic by trade. I examined the Concord on the Wednesday before the explosion. The boiler head was bulged out, and, in my opinion, one long stay-rod was broken. It was not safe and proper for an engineer to run with the stay-rod in the condition that was, or with the boiler head in the condition that was. I saw the engine the next day after the explosion ; some stay-bolts were broken ; some were pulled through the sheet ; and sediment had oozed through the crack in the side sheet in some places. If the boiler head is bulged out, I consider it necessary to make a thorough examination of the inside, by a person going inside. The side crack could have been seen from the inside." Cross-examination : " I mean by a trained mechanic, one brought up to the business. Seven or eight trades are required to make and repair engines ; each shop has a mechanic at its head ; a man might be blacksmith or boiler-maker and be a competent master mechanic. The side crack was the cause of the explosion. I have no doubt of it. To see this crack it would be necessary to take out the throttle-pipe, dry-pipe, two stay-rods, and part of the crow-foot stays. Cracks are liable to close up, and often require close inspection to discover them when the surface is exposed to view."

Lucius P. Barnes testified : "I am foreman of the **Vermont and Massachusetts** Railroad shop. It is not safe to run an engine with a broken stay-rod. After the explosion, I saw the crack; one of the long stay-rods was broken; some of the stay-bolts were corroded off. It is not safe to run an engine with a bulge in the back head, or with stay-bolts corroded off, or with deep cracks, such as in the Concord, or when it takes two men to shut off the throttle." Cross-examination : "A competent engineer ought to know that it is not safe to run an engine with a bulge or with a broken stay-rod. The bulge did not cause the explosion, nor the broken stay-rod. The crack was the cause." Reexamination : "The bulge in the back head would indicate weakness in the boiler. It would not be proper to run the engine without an examination of the whole boiler."

John Webster testified : "I am master mechanic of the Boston, Clinton and Fitchburg Railroad. After the explosion, I saw the long crack near the seam just below the lap. If a proper examination had been made, by going inside, a part of it could have been seen. It is not safe to run the engine with that crack, or with a stay-rod broken, or with a bulge in the back head, without examination. There is no difficulty in finding out the cracks, broken rods and bolts, by an examination inside. A master mechanic should be a mechanic by trade, one who has worked on engines and understands them." Cross-examination : "Two or three inches of the crack under the lap might have been seen. If there were no leak, I should not be looking for cracks. The crack was the cause, and only cause of the explosion."

A. B. Cleveland testified : "I have been a machinist twenty years. I should think the long crack might have been seen. The old cracks in the back head could have been seen. None of the cracks in the boiler head blew out. Some of the short stay-bolts in the upper row were rusted off." Cross-examination : "I do not know that the crack was the cause of the explosion."

Charles H. Damon testified : "I am a machinist, and work on engines for the Boston, Clinton and Fitchburg Railroad. I saw the crack inside the sheet after the explosion. It looked old, as if steam had been oozing through in one place. The short stay-

bolts in the top row were pretty old; some were eaten off by rust. One long stay-rod was broken. There is no difficulty in discovering a crack in a boiler. No difficulty in seeing the whole side down to the stay-bolts. I saw cracks in the boiler head." Cross-examination: "When steam oozed through, there was nothing that would show through the lagging."

Edwin Hanscomb testified: "I am an engineer. I saw the crack after the explosion. There was a place two inches long where the steam had oozed through, and formed a sediment on the outside." Cross-examination: "I think the crack was the sole reason for the explosion."

Henry J. Colburn testified: "I saw the crack after the explosion. There was a white deposit on the outside, as if it had been there accumulating." Cross-examination: "I could not say whether oozing would show outside of the lagging."

The president, directors and superintendent of the defendants testified that Cooledge was appointed master mechanic, after diligent search, as the best man they could obtain; that they considered him competent; that they never heard any complaint concerning him, or about the Concord; and that it was not their business personally to inspect the condition of the engines.

John H. Edgecombe testified as follows: "I worked for the defendants. I took the lagging off after the explosion. The crack was above where the lagging came down. I took out the long stay-rods; there were six; none were broken."

Alonzo Smith testified: "I am an engineer on the defendants' railroad. I ran the Concord two or three months, six months before the explosion. I knew of no defect in the boiler. I never saw steam oozing out of the side. There was a bulge in the back head, an inch about the throttle-stem. I saw it first four years ago."

Oliver Ayres testified as follows: "I was formerly master mechanic of the defendants. General repairs were made on the boiler of the Concord in 1859. The whole of that part of the boiler, including the fire-box, was made new at that time, of the best quality of iron. I saw the crack after the explosion. The crack comes below the top of the crown sheet and crown bars of

the fire-box. The crack could not have been seen without taking out the fire-box. I never knew a fire-box to be taken out for the purpose of examination of boiler. A fire-box burning soft coal will last five years. I have known Cooledge twenty years. He was engineer while I was master mechanic, and worked part of the time in the shop on repairs. I think him entirely competent for master mechanic. There can be no training better than his. I never considered it necessary for a man to be a trained mechanic in order to be a competent master mechanic, nor has it been so considered by the railroads in New England. In selecting master mechanics of roads of the size and general character of the Fitchburg Railroad, it is not usual to regard the fact of a man's being a mechanic by trade as essential to the position of master mechanic. For twenty-five years, a large majority of master mechanics on railroads in New England have not been trained mechanics or machinists. In selecting master mechanics myself, I have not regarded it as essential. Cooledge worked in the shop three or four days in a week, setting up and taking apart engines."

George A. Cooledge testified as follows: "I am master mechanic for the defendants. I was fireman three years, and engineer ten years, working a third of the time in the repair shop, taking apart and setting up engines. I never knew, suspected or was informed of any defect in the Concord. The bulge was in the back head since 1867. After the explosion I saw the crack. It was not visible on the outside before the explosion. The lagging came ten inches below it. There was no position where a man could get his eyes where he could see it inside. The plaintiff spoke to me on Saturday, before the explosion, of the bulge and stay-rod. He said the throttle worked hard. I knew it worked very hard, as it will with engines of that class. General repairs were made on the Concord in 1867 and 1869. In 1867 everything inside of the boiler was removed, except the fire-box and crown bars. Under my directions, a thorough examination of the entire boiler was made. I instructed my boiler-maker to make a thorough examination, and I think I was inside. That is my practice. In 1869 new stay-rods were put in, and a

new front flue sheet and front course in the boiler, and under my direction a thorough examination was then made, so far as could be without taking out the fire-box. The Concord, from 1859 to the explosion, was used mostly as a spare engine, and its entire use amounted to about five years' continuous service. It is never practised to take out the fire-box to examine the outer sheet of a boiler." Cross-examination: "The cracks in the boiler head I did not know of till after the explosion. No cracks were visible there in 1867; I went in myself. When the plaintiff told me the throttle worked hard, I told him it always did; I told him the boiler head had been sprung out a long time. I did not think the stay-rod broken; it had been in but a year, and was of the best material. No means of discovery exist as to cracks in this position. It is practically safe to run an engine with a broken stay-rod, but I would not allow an engineer to run with a broken stay-rod, if I thought it broken. An extra number are put in for contingencies. The mere fact of the bulge would not tend to weaken the boiler head. In February preceding the explosion I had an examination of the throttle. From my present knowledge, I should think the engine unsafe for a year before the explosion. I never served an apprenticeship as a mechanic, nor worked for a series of years in a shop."

Frank Maddox testified as follows: "I am foreman of the round-house of the defendants' railroad. I am a machinist by trade. I knew the Concord. I never knew, suspected or was informed of any defect in her. After the dispatch came, I talked with the plaintiff. I got on the engine. The plaintiff told me that a long stay-rod was broken; that he rapped on the head of the stay-rods. I told him I did not think he could tell in that way. The lagging came down to the running board." Cross-examination: "I took no means to ascertain whether there was a broken stay-rod. I could not see the crack if all the crown bars were out, in any way I can think of."

Edward Tourtelotte testified as follows: "I am foreman of the machine shop of the defendants. I knew the Concord. I never knew, suspected or was informed of any defect in her. In 1869, when repairs were made, I went inside of the boiler, up to the

back flue sheet, and examined the side sheet and wagon-top sheet with a lamp as carefully as possible. I saw no defect. After the explosion, I saw the stay-rods taken out and gave them to Austin D. Robinson. None were broken. The lagging came down below the crack to the second row of stay-bolts. The crack could not be seen from inside."

Austin D. Robinson testified that he received the stay-rods after they were taken out of the Concord, and that none were broken.

William Stoumant testified as follows : " I am a boiler-maker, and have been so twenty-four years. I repaired the boiler of the Concord in 1867. I examined the boiler all over inside, with a lamp, as far as I could see. In 1869 I examined the boiler as before, to see if I could find any defect. I saw no defect. I never knew or suspected any defect. I could not discover this crack without taking out the fire-box. The stay-bolts looked well in 1869. In 1869 there were no cracks in the boiler head."

Edmund Grady testified as follows : " I have been a boiler-maker for the defendants for six years. I worked on the boiler of the Concord in 1867 and 1869. I examined the boiler in 1869, by the aid of a lamp, inside. I noticed the stay-bolts. I saw in the whole length. None were broken in the boiler, so far as I could see. The crack in the side sheet could not be seen from the inside."

Moses Bayley testified as follows : " I have been engineer on the defendants' railroad for seven years. I ran the Concord eight months. I saw a bulge round the throttle ten years ago, the same as since the explosion." Cross-examination : " I took her out two or three days before the explosion to water. I said I would not take and run her as a regular thing. I think she was not fit to run with a regular train. It took the fireman and myself to shut her off."

Ezra B. Cole and one Newton testified that they were engineers, had run the Concord, knew of no defect in the boiler, and never saw steam or water issuing out of the side.

Several experts testified " that in their judgment the crack in the side sheet could not have been seen without removing the fire-

box or crown bars ; that the training which it appeared Cooledge had had would be the best training to make a man a competent master mechanic of a railroad ; and that, in selecting a master mechanic, railroad companies do not usually regard it as necessary that the candidate should be a mechanic by trade."

It was admitted by the plaintiff that the Concord was originally a suitable and proper machine for the purpose for which it was designed.

The foregoing was all the evidence now material to report.

The part of the boiler showing the entire fracture, and also the stay-rods were viewed by the jury.

At the close of the evidence, the defendants asked the judge to rule that there was no evidence to go to the jury in mainten-ance of the action ; but the judge refused so to rule.

The defendants then asked the judge to give the following rulings : " 1. The rules of the defendants, under which the plaintiff worked, constituted a part of the contract of his employment, and any intentional violation of any of them by him would deprive him of any rights arising from the relation in which he stood to the defendants, so long as such violation continued. 2. Under the rules of the defendants, which prescribed the duty and ascertained the rights of the plaintiff, in respect to the operation of his engine, he was the absolute judge of whether, at any time, the engine was safe to proceed, and was in good running order ; and in respect to those questions was wholly independent of Cooledge or Maddox, or any other employé of the defendants. 3. If the plaintiff knew, or had reasonable cause to believe, the engine to be unsafe, [or not in good working order,] he cannot recover. 4. If the defendants used reasonable care originally in furnishing a suitable and safe engine for their road, and in putting the same into the hands of fit and suitable agents to be kept in repair, they are not liable in this action for injury caused by any defect or want of repairs therein subsequently existing. 5. The plaintiff's knowledge, as shown by the evidence in this case, of the defective condition of the engine, and his continuing to use the same after such knowledge, is conclusive evidence of a want of due care on his part. 6. The plaintiff's knowledge that

the engine was not in good order, and his using the same with such knowledge, is conclusive evidence of want of due care on his part; and if such knowledge and such use by him is proved by the evidence, he cannot recover. 7. The defendants are not liable in this case unless the plaintiff proves that the president, directors or superintendent either personally knew, or, by the exercise of reasonable care in the performance of their duties, might have known of the existence of the defect in the engine, which caused the explosion; or unless the plaintiff proves that the president, directors or superintendent either personally knew, or, by the exercise of reasonable care in the performance of their duties, might have known, that the person or persons employed to have the charge of the engine and keep it in repair were incompetent; and further proves that such incompetency caused the accident. 8. If the plaintiff violated any of the rules, and the accident would not otherwise have happened, he cannot recover. 9. Although Cooledge and Maddox failed, through incompetency, to make such examination of the boiler as the bulge in the back head, the condition of the stay-rods or throttle reasonably called for, and although, had they made such examination, the cause of the accident would probably have been discovered and the same prevented, still the defendants are not liable on that account. 10. The master mechanic was a fellow-servant of the plaintiff, and the defendants are not liable for the negligence, if any, of the master mechanic in failing to keep the engine in repair."

These rulings the judge refused to give, except the third, which he gave, omitting the words in brackets.

The judge, at the request of the defendants, also gave the following ruling : " If the plaintiff ran the engine when it was not in good working order, knowing it to be such; and the particulars in which it was not in good working order were signs of a defective condition in the boiler, causing an explosion, by which the plaintiff was injured, and a competent engineer ought to have known that such particulars were signs of such defective condition, and the plaintiff held himself out as such a competent engineer when he entered into the employment of the defendants as an engineer, he cannot recover."

The judge instructed the jury as follows: "A person entering into the service of another takes upon himself, in consideration of the compensation to be paid him, the ordinary risks of the employment, including the negligence of his fellow-laborers." "The general rule is, that he who engages in the employment of another, for the performance of specific duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, embracing perils arising from the negligence of those in the same employ as incident to the service." "When a master uses due diligence in the selection of competent and trustworthy servants, and furnishes them with suitable means to perform the service in which he employs them, he is not answerable to one of them for an injury received by him in consequence of the carelessness of another, while both are engaged in the same service." "A corporation is required to use due care in supplying and maintaining suitable instrumentalities for the performance of the work or duty which it requires of its servants, and is liable for damages occasioned by neglect or omission to fulfil this obligation, whether it arises from its own want of care, or that of its agents intrusted with the duty. But the law does not hold it responsible for the negligence of its servants, if of competent skill and experience, in using or managing the means and appliances placed in their hands in the course of their employment, if they are neither defective nor insufficient." "The rules of law are well settled, that a servant, by entering into his master's service, assumes all the risks of that service, which the master, exercising due care, cannot control, including those arising from the negligence of his fellow-servants; but that the master is bound to use ordinary care in providing suitable structures and engines and proper servants, to carry on his business, and is liable to any of their fellow-servants for his negligence in this respect. This care he can and must exercise, both in procuring and in keeping and maintaining such servants, structures and engines. If he knows, or in the exercise of due care might have known, that his servants are incompetent, or his structures or engines insufficient, either at the time of procuring them or at any subsequent time, he fails in his duty. **For the**

management of his machinery and the conduct of his servants, he is not responsible to their fellow-servants; but he cannot avail himself of this exemption from responsibility, when his own negligence in not having suitable instruments, whether persons or things, to do his work, causes injury to those in his employ. He cannot divest himself of his duty, to have suitable instruments of any kind, by delegating to an agent their employment or selection, their superintendence or repair. A corporation must, and a master who has an extensive business often does, perform this duty through officers or superintendents; but the duty is his and not merely theirs, and for negligence of his duty in this respect he is responsible. To hold otherwise would be to exempt a master, who selected all his machinery and servants through agents or superintendents, from all liability whatever to their fellow-servants, although he had been grossly negligent in the selection or keeping of proper persons and means for conducting his business."

" The obligation of a corporation, so far as respects those in its employment, does not extend beyond the use of ordinary care and diligence. By ordinary care and diligence is meant such as men of ordinary sense, prudence and capacity, under like circumstances, take in the conduct and management of their own affairs. This varies according to circumstances as the risk is greater or less, and must be measured by the character and risks and exposures of the business."

Applying the law as stated to the present case, the judge instructed the jury that " the exercise of ordinary diligence and care was required on the part of the defendants, and their proper officers and agents, in providing a suitable engine to be used by the plaintiff upon their road, and in keeping the engine in proper condition for such use; that the plaintiff was also required to exercise ordinary diligence and care in the use of the engine and in avoiding danger therefrom; that if neither party was in fault the plaintiff could not recover; that if the injury complained of was occasioned by the fault or negligence of both parties, the plaintiff was not entitled to recover; that if the defendants, acting by their proper officers and servants, exercised ordinary diligence and care in providing a suitable engine and in keeping the

same in proper condition and repair, for the use to which it was appropriated, they were not responsible for the injury complained of ; but that if they failed so to do, and the injury complained of resulted from their neglect in this respect, then the defendants were responsible therefor, unless it appeared that the plaintiff himself was also wanting in the exercise of ordinary vigilance and care, either in the management of the engine or in improperly exposing himself to danger therefrom, thereby rendering himself guilty of contributory negligence, in which latter case he was not entitled to recover; that the burden was upon the plaintiff to show, not only that the defendants were guilty of negligence in not exercising ordinary diligence and care in providing a suitable engine, and keeping it in proper condition, thereby causing the injury complained of, but that he was himself free from any negligence contributing to the injury ; that Rule 28 did not, as a matter of law, release the defendants from their legal responsibility in this case, if any such existed, for the internal and invisible defects in the boiler, by which it was claimed the explosion was occasioned ; and that the violation of Rule 42, so far as it stated it to be the duty of the plaintiff to be sure that the engine was in good working order before it was taken from the engine-house, did not, as matter of law, necessarily preclude him from recovering in this case, if otherwise entitled, unless the accident or injury complained of was occasioned in whole or in part by such violation."

The jury returned a verdict for the plaintiff, and the defendants alleged exceptions.

*H. B. Staples & F. P. Goulding,* for the defendants. The repair of engines is a constant and necessary incident to the business of running a railroad, and the repair shop is as much an accessory of the enterprise as station-houses and switches. Negligence in keeping the engine in repair was negligence of a fellow-servant. To maintain that the servants of the corporation engaged in the constantly needed repairs upon engines are not fellow-servants of those engaged in running them, is to maintain a distinction impossible to apply in practice. The plaintiff him-

self sometimes worked on repairs. *Farwell* v. *Boston & Worcester Railroad Co.* 4 Met. 49. *Hayes* v. *Western Railroad Co.* 3 Cush. 270. *King* v. *Boston & Worcester Railroad Co.* 9 Cush. 112. *Gillshannon* v. *Stony Brook Railroad Co.* 10 Cush. 228. *Seaver* v. *Boston & Maine Railroad,* 14 Gray, 466. *Durgin* v. *Munson,* 9 Allen, 396. *Gilman* v. *Eastern Railroad Co.* 13 Allen, 433. *Hackett* v. *Middlesex Manuf. Co.* 101 Mass. 101. *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572. *Hard* v. *Vermont & Canada Railroad Co.* 32 Verm. 473. *McGlynn* v. *Brodie,* 31 Cal. 376. *Tarrant* v. *Webb,* 18 C. B. 797.

Any statements in *Snow* v. *Housatonic Railroad Co.* 8 Allen, 441, and *Gilman* v. *Eastern Railroad Co.* 13 Allen, 433, which tend to support the position taken by the plaintiff, are merely *obiter dicta.*

There was no evidence of general incompetency on the part of Cooledge or Maddox; certainly none to affect the defendants with knowledge of such incompetency. The construction which the defendants sought to put upon the rules was the correct one. A wilful or negligent use of an engine in violation of the master's express directions deprives the servant of any remedy for an accident happening from such use. To knowingly use an engine, defective or not in good working order, is, of itself, a want of due care.

The plaintiff must show that the negligence of the defendants was the proximate cause of the accident. Negligence to do something which " would probably " have resulted in the discovery of the defect, is not proximate. The crack could not have been discovered without a virtual destruction of the engine. On the uncontrolled evidence, everything had been done to render the engine safe by proper examination and repair. The only signs from which it is even claimed that any further or different examination should have been instituted, were known equally as well to the plaintiff as to the agents of the defendants. The plaintiff was guilty of negligence in failing to inform Cooledge that he had procured an examination on the Wednesday before the explosion, and in failing to inform Maddox that experts had made the examination. If he had a right to rely upon their judg-

ment, he was bound to fully communicate to them all he knew about it.

*G. A. Torrey*, for the plaintiff.

COLT, J. This action is founded on the alleged negligence of the defendant corporation in failing to provide and keep in repair a safe and suitable engine to be run by the plaintiff in his employment as locomotive engineer upon its road. The law applicable to cases of this description, and which defines the rights and duties that belong to the relation of master and servant, is plainly stated in the recent decisions of this court. The principles are discussed and the cases sufficiently reviewed in *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572, and in *Gilman* v. *Eastern Railroad Co.* 10 Allen, 233, and 13 Allen, 433, and *Huddleston* v. *Lowell Machine Shop*, 106 Mass. 282.

Upon a careful consideration of the evidence and the instructions given, we find no error in law for which this verdict should be set aside. The legal principles which govern the case were accurately stated. They were well adapted to the whole evidence in its different aspects, and they were all that the case required. The jury, who are presumed to have been controlled by these instructions and the evidence before them, must have found, in arriving at their verdict, that the defendant corporation, by its agents, intrusted with that duty, did not exercise ordinary care and diligence, in supplying and maintaining an engine, safe to be used for motive power upon their road, in the performance of that part of the plaintiff's work in which he was engaged at the time ; that this neglect was the cause of the injury ; and that the plaintiff was himself in the exercise of ordinary care and diligence, in the use of the engine, and in avoiding danger therefrom. They must have further found, that the plaintiff did not know, or have reasonable cause to believe, that the engine was unsafe at the time of the explosion, and also that the injury was not, in whole or in part, caused by any violation of the terms of his contract of employment, as expressed in the rules of the road assented to by him.

This establishes the defendant's liability. It is enough that there was evidence in support of these several findings, sufficient

to justify each. It is not a question of the weight of evidence, or whether the verdict ought not to be set aside on a motion for a new trial. When the question is raised by exceptions, the only inquiry is, whether there is any evidence proper to submit to the jury as having a tendency to support the legal propositions which charge the defendant with liability. *Forsyth* v. *Hooper*, 11 Allen, 419.

The rule of law which exempts the master from responsibility to the servant for injuries received from the ordinary risks of his employment, including the negligence of his fellow-servants, does not excuse the employer from the exercise of ordinary care in supplying and maintaining suitable instrumentalities for the performance of the work required. One who enters the employment of another has a right to count on this duty, and is not required to assume the risks of the master's negligence in this respect. The fact that it is a duty which must always be discharged, when the employer is a corporation, by officers and agents, does not relieve the corporation from the obligation. The agents who are charged with the duty of supplying safe machinery are not, in the true sense of the rule relied on, to be regarded as fellow-servants of those who are engaged in operating it. They are charged with the master's duty to his servant. They are employed in distinct and independent departments of service, and there is no difficulty in distinguishing them, even when the same person renders service by turns in each, as the convenience of the employer may require. In one the master cannot escape the consequence of the agent's negligence; if the servant is injured in the other he may.

There was no error in refusing to instruct the jury as specifically requested. The first ruling asked would absolve the defendant from any duty to the plaintiff, in case of his violation of any rule which he had agreed to observe. Such violation would perhaps justify the defendant in putting an end to the relation, if it saw fit. But until so terminated, the defendant must be held to the legal responsibilities assumed.

The second instruction asked, as to the effect of the rules referred to, in imposing the sole responsibility upon the plaintiff,

was not warranted by their true meaning. Rule 28 clearly refers to accidents on the road which would make it unsafe to proceed; and Rule 42 imposes upon the engineer the duty of seeing that his engine is in good working order. The jury were told that the first of these rules did not relieve the defendant from responsibility for internal and invisible defects in the boiler, and that the last would not preclude the plaintiff from recovering, unless the injury complained of was occasioned, in whole or in part, by such violation; but that, if the plaintiff knew, or had reasonable cause to believe, the engine to be unsafe, he could not recover.

As to the third, fifth and sixth rulings asked, it is plain that the plaintiff's knowledge that the engine was not in good working order, and was to some extent defective, is not conclusive evidence of want of due care on his part. It was for the jury to consider on the question of the alleged contributory negligence of the plaintiff; and they were told that if the plaintiff ran the engine when it was not in good working order, knowing it, and knowing that its condition was a sign of the defect which caused the explosion by which he was injured, or when, as a competent engineer, he ought to have known it, he could not recover. The fact that it was in violation of an express rule is not material, unless such violation was a direct cause of the injury. *Clarke* v. *Holmes*, 7 H. & N. 937.

The fourth and seventh requests, so far as they differ from the instructions given, were deficient. The corporation is equally chargeable, whether the negligence was in originally failing to provide, or in afterwards failing to keep, its machinery in safe condition. The duty is essentially the same, and no sound distinction can be established in favor of the defendant on this ground; and for the rest, the question was not whether the officers named knew, or might have known, of the defect, or of the incompetency of those who had charge of the repairs, but whether the corporation in any part of its organization, by any of its agents, or for want of agents, failed to exercise due care to prevent injury to the plaintiff from defects in the instrument furnished for his use.

The ninth and tenth instructions asked assume that the plain-tiff's injury was caused by the incompetency of fellow-servants. But the action is for failing in the exercise of ordinary care to provide a suitable engine for his use in the work required. This involves an inquiry into the existence and character of the defect, the sufficiency of the means employed for its discovery and removal, the duties required of those charged with the work of providing and keeping in safe working order the motive power of the road, and the fidelity with which these duties were discharged. This all concerns the obligations imposed upon the master, and the jury may have found for the plaintiff without regard to the competency or incompetency, the care or the negligence, of the officers named. The instructions given were all that were required. *Exceptions overruled.*