REPUBLIC IRON & STEEL CO. v. THOMASINO.†

(Circuit Court of Appeals, Fifth Circuit. February 8, 1910.)

No. 1,984.

MASTER AND SERVANT (§ 221*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK.

Plaintiff's intestate, who was an experienced miner, while working with a helper in a room in defendant's coal mine was killed by the falling of the roof. It was the duty of defendant to furnish props to support the roof, and of deceased to set them up as the work progressed and the end of the room was extended. Two or three days before his death, he had asked defendant's superintendent or bank boss for props for use in his room, but they were not furnished; the boss telling him to keep on at work, that the roof was all right, and that he would send him props soon. Deceased continued his work, and at the time the roof fell had extended the room for 20 or 30 feet beyond the last props, which rendered the place where he was working dangerous, as he knew. On the morning of his death, he had examined the roof and then continued his work. *Held,* that in so doing with full knowledge of the conditions he assumed the risk, and that defendant, although negligent, could not be held liable for his death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 638–647; Dec. Dig. § 221.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

Shelby, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Alabama.

Action by Leon Thomasino, administrator, against the Republic Iron & Steel Company. Judgment for plaintiff, and defendant brings error. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied March 22, 1910.

This action was brought by Leon Thomasino, hereinafter styled "plaintiff," as administrator of the estate of Tony Thomasino, against the Republic Iron & Steel Company, hereinafter styled "defendant," claiming $20,000 damages for the killing of plaintiff's intestate.

The complaint charges that the defendant was operating a coal mine at or near Sayreton, Jefferson county, Ala., and that on August 16, 1905, the said Tony Thomasino was in the employment of the defendant as a coal miner, and, while so engaged in and about the said service of the business of the defendant in said mine, a part of the roof or top of the said mine fell upon said Tony Thomasino, and as a proximate consequence thereof he was so injured that he died.

In the first count of the complaint it is charged that the death was caused by reason of a defect in the condition of the ways, works, and machinery or plant used in connection with the said business, to wit, the roof or top of said mine was not sufficiently propped to prevent its falling, which defect arose from or had not been discovered or remedied, owing to the negligence of the defendant or of some person in the service or employment of the defendant intrusted with the duty of seeing that the ways, works, and machinery or plant were in proper condition.

In the second count it is charged that the death was the proximate consequence of the negligence of a person in the service or employment and intrusted by the defendant with superintendence while in the exercise of such superintendence, to wit, one W. M. Mason.

And in the third count the death is charged as occurring through the proximate cause of the negligence of a person in the employment of the defendant with superintendence whilst in the exercise of such superintendence, to wit, some person unknown.

The fourth count is very similar to the second, but charges that said Mason negligently failed to sufficiently prop or secure from falling the said roof or part thereof which fell upon and killed the said intestate.

The fifth count is similar to the third, but more specific in charging that some unknown person intrusted with superintendence negligently failed to sufficiently prop or secure from falling said roof or part thereof.

The sixth count charges that the death was the proximate consequence of the negligence of said Mason intrusted by the defendant with and exercising superintendence in failing to furnish plaintiff's intestate with sufficient props to secure said roof.

And the seventh is similar to the sixth, except it varies in charging that the negligence of an unknown person in the service or employment of the defendant charged with superintendence negligently failed to furnish plaintiff's intestate at his place of work a sufficient number of props to secure said roof or part thereof, etc.

The defendant answered with a plea of not guilty; that it was the duty of plaintiff's intestate to keep his room properly timbered or propped; that he negligently failed to timber or prop said room, in that he placed the timbers or props of said room at too great a distance apart, thereby rendering said roof likely to fall; that his negligence in this regard contributed to and was the proximate cause of his death; that the fall of said roof was caused by the fact that the timbers by which the same was propped were placed at a distance of 16 feet from the face of said mine rendering the roof thereby likely to fall; that the timbering of the said room in this manner was unsafe and dangerous, and such danger was obvious and apparent to plaintiff's intestate, and, notwithstanding such obvious and apparent danger, plaintiff's intestate undertook to mine in said room with the roof thereof timbered in such manner, and thereby assumed the risk of the roof falling upon him; that plaintiff's intestate was killed by the roof falling upon him because it had been improperly propped or supported by timbers; that plaintiff's intestate had been cautioned by the defendant as to the necessity of having any such props; that, notwithstanding such caution and warning, he continued to work in said mine while such props or timbers were in there at such distance, and thereby he assumed the risk of said roof falling; and, finally, that plaintiff's intestate was aware that the roof was not propped or supported by props and was rendered unsafe, thereby and notwithstanding said knowledge plaintiff's intestate continued to mine under said roof, whereby and as a proximate consequence of which plaintiff's intestate was killed.

There was considerable skirmishing with demurrers to the complaint, to the pleas, and to the replications, not necessary to recite, and the parties went to trial on the issues as presented by the plaintiff as above mentioned, and the pleas of the defendant.

On the trial there was evidence showing that Tony Thomasino was killed while in the employment of the defendant as a coal miner. He had been in the employment of the defendant some six months. On seeking the employment, he represented himself as a practical coal miner and was given the job as such and assigned to a room with another miner, his cousin, Joe, as an assistant or "buddy." From the time he entered the service of the defendant he worked in the same room driving it 150 feet from the heading until August 16, 1905, when he was killed by the roof of his room falling upon him. The roof fell because it was not sufficiently propped or supported by timbers.

On the trial it was conceded that it was the duty of plaintiff in error to furnish the timbers for propping, and the duty of said Tony Thomasino to look after his room and set the necessary props. Both said Tony Thomasino and his assistant knew for what purpose props were used, how to set them, and that there was danger when not used; in fact, there was undisputed evidence showing that Tony Thomasino had been actually warned as to the danger if he did not prop, and, on one occasion, he had been suspended by the mine foreman because he failed to obey instructions by not setting the mine props close enough together.

There was also undisputed evidence showing that two or three days before Tony Thomasino was killed he was warned by his boss that he was not propping close enough to the face, and that it was dangerous rock, and he was told to set props closer, and promised to do so. It appears further, and on undisputed evidence, that each day a miner and his assistant in mining average from five to six feet into the face of the room, so that a new roof from five to six feet in length is over the mine as the miner does his work.

It was admitted by the plaintiff that Tony Thomasino's room was not properly propped, and that his death was due to that fact; but it was contended by the plaintiff that said Tony Thomasino had requested the defendant to furnish the necessary props, and it had failed to do so, and that upon such request the superintendent had told him, in effect, to go ahead and do the work, he would send him timbers to-day—"The top is all right. Just as soon as I can I will send you props."

The strongest and most favorable evidence in favor of the plaintiff is the evidence of Joe Thomasino, given in full as follows:

Joe Thomasino, a witness for the plaintiff, testified, in substance, as follows:

My cousin, Tony Thomasino, and myself were working for defendant company at Sayreton, on August 16, 1905, and were working together under the same roof. Tony had been working at that time about six months. I don't know what he worked at before this. I was present when Tony was killed, was about 14 or 15 feet from him. Some rock fell from the top of the room on him and killed him. The rock was four or five inches thick. Tony was killed between half after 11 and half after 1 o'clock in the morning. When we went to work that morning, Tony and I examined the roof, and it seemed all right. I had worked one month as a miner with Tony Thomasino. Tony knew better about mining than I did.

Here the witness was asked the following question: "Whose duty was it to furnish props to the miners working in the mines?" And the court stated: "Isn't that without dispute?" And it was thereupon stated by defendant's counsel that there were two things not in dispute. One was that it was the duty of the company to furnish props, and the other was that it was the duty of the miner to set the props and prop his own room, and to this statement counsel for plaintiff made no objection.

I heard the conversation on top between Tony and Mr. Mason when Tony asked him for props, and Mr. Mason said: "The top is all right. You go ahead and go to work. If you don't go to work, you can quit." Mr. Mason said: "Never mind, you go ahead. The top is all right, and after a while, as soon as I can, I will send you props." We then went to work, and the driver came into the room, and we asked him for props, and he said he didn't have any, and said: "You will have to tell it to the boss." No props were sent to our room after we asked for them. If props had been under our roof it would not have fallen. If it had been propped it would have made a motion when it

started to fall, and we could have heard it and got out of the way. The nearest prop from the face of the mine at the time the roof fell was from 20 to 30 feet. It was, about two, or may be three, days after he heard Tony ask Mr. Mason for props before Tony was killed.

On cross-examination this witness testified as follows:

"I had worked in this same room ever since I had commenced mining. Tony was working in that room when I commenced working there. We had been setting props under the roof, and we set them under the roof for the purpose of keeping the roof from falling on us. I knew, and Tony knew, that the roof had to be propped, and if it had been propped the props would have held the roof, and if the roof had started to fall they would have held it until we got out of the way. Tony and I had been putting in these props together all the time we worked there. Tony was boss over me. I was his buddy, and he was a miner. Tony would direct me where to put the props, but pretty soon I learned myself how to put the props. We worked in this room about four or five days before Tony was killed without putting any props up at all."

Thereupon the witness was asked the following question: "Didn't you know that there was danger of that roof falling without you put a prop?" To this question the plaintiff objected, the court sustained the objection, and the defendant excepted.

This was, in substance, the testimony of this witness, and all the tendencies thereof.

Joe Immodino, a witness for the plaintiff, testified as follows:

"I was working for the Republic Iron & Steel Company, at Sayreton, on the 16th day of August, 1905. I knew Tony Thomasino before his death, and had known him for six or seven months. He had been working there several months before he was killed, and I had been working there about 12 months. Mr. Mason was the bank boss for the defendant company. His duties were to look after the place, and send props to prop the place. I heard Tony Thomasino ask Mr. Mason for timbers, and Mr. Mason said: 'Go on to work. I will send you timbers to-day. That the top was all right.' Tony Thomasino asked Mason for the timbers, and Mason told him to go on to work, he would send timber to-day, two or three days before Thomasino was killed. Thomasino went to work after that. It was the duty of the company to furnish the props. The conversation between Mason and Thomasino about the props occurred outside of the mine and some time inside of the mine. At the time the conversation about the props took place, Salvador Lavito and Joe Thomasino were present."

On cross-examination, this witness testified, in substance, as follows:

I have been a miner for about seven years, and have worked at Sayreton for two or three years. Every miner has a buddy who helps in the mine. It is the miner's duty to prop the roof in his room, and Tony Thomasino was a miner. The company furnished the props, but it was the miner's duty to set them up. It was customary to set the props to within 10 feet of the face of the room. I went into the room where Tony Thomasino was killed, right after he was killed, and the nearest timber to the face of the room was from 20 to 30 feet. Tony had been working in that mine six or seven months before he was killed. When the miners want timbers, they ask the driver for them, and the driver would bring them; but, if the driver didn't bring them, then you would tell the bank boss, and the bank boss would tell the driver. The bank boss never brought the timber himself, but the driver brought them. The driver for Tony was a white man named Reid. I worked at the time Tony was killed in room 40, and Tony worked in room 45. I put up my own props. I put the props in my room, and it was Tony's duty to prop his room. The conversation I heard between Tony and Mr. Mason about the props occurred two or three days before Tony was killed. It had been three or four days before this that Tony had not had any timbers. When Tony asked for props from Mason at the top of the mine, he told Mason that he had no timbers or props. In the mine at that time they averaged from four, five, or six feet a day into the face of the mine. I never saw any timbers at that time along the heading. At this time I cannot remember whether there were any timbers at the top of the mine or not. Tony had been working in the same room he was killed in, and had been the miner who has had that room, ever since he had been work-

ing for the company, and he had been working for the company about six or seven months.

This was, in substance, all the testimony of this witness, and all the tendencies thereof.

There was other evidence on the part of plaintiff and considerable on the part of defendant, all found in the transcript and bearing upon issues in the case, but not necessary to recapitulate.

The bill of exceptions shows that, after the evidence was closed, the defendant made numerous requests for charges on specific propositions arising and supposed to arise in the case, which were refused by the court and exceptions duly reserved. Among them were the following:

"The court charges the jury that if you believe the evidence in this case you cannot find for the plaintiff.

"The court charges the jury that if you believe the evidence in this case you cannot find for the plaintiff under the sixth count of the complaint.

"The court charges the jury that if you believe from the evidence that, on the day the plaintiff's intestate was killed, he tapped or sounded the room and concluded that it was safe, and that he continued to mine depending on his own judgment as to the safety of said roof, then the plaintiff cannot recover.

"The court charges the jury that if you believe from the evidence that plaintiff's intestate knew that props were necessary and were used to support the roof and prevent the same from falling in, and that without the same being used there was danger of the roof falling upon him, and that with such knowledge he continued to mine under the roof without said props, and that the roof fell upon him because it was not propped, then your verdict must be for the defendant, and this must be your verdict under such circumstances, even though you may believe from the evidence that the defendant had no props on hand, or that it negligently failed to provide them to plaintiff's intestate after it had been requested by him to do so."

The jury found for the plaintiff in the sum of $2,500, on which verdict judgment was rendered, and defendant, after vainly seeking a new trial, sued out this writ of error.

The errors assigned are numerous, but they cover the refusals to charge as set out above.

Walker Percy and Borden Burr, for plaintiff in error.

Frank S. White and Thos. T. Huey, for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and FOSTER, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). It is undisputed that it was the duty of the defendant to have furnished the plaintiff's intestate with sufficient props to support the roof of the room where he was mining, and that it was the duty of the plaintiff's intestate to properly set the props. See Sloss Sheffield Steel & Iron Co. v. Green (Ala.) 49 South. 302.

The evidence is conflicting as to whether the defendant did its duty in furnishing the props—it is undisputed that the plaintiff's intestate did not set any props in the last 4 to 5 days of his work nor in the last 20 to 30 feet of his room.

The plaintiff's evidence shows that plaintiff's intestate worked in his room three or four (Joe Immodino), two or three (Joe Thomasino) days without putting up props, and then called on the mine foreman for props, and the bank boss said: "Go to work. I will send you timbers to-day. That the top was all right." Joe Immodino. "Go to work. To-morrow I will send you the props." Lavito. "The top is all right. You go ahead and go to work. If you don't go to work you can quit." Or "Never mind, you go ahead. The top is all right, and after a while

as soon as I can I will send you props." Joe Thomasino. And after the application for props the plaintiff's intestate worked on two or three days extending his room and the unsupported roof thereof, when the roof fell and killed him.

The undisputed evidence shows that the plaintiff's intestate was an experienced miner, that he knew of the necessity of propping his roof as he advanced further in his work and of the danger of its falling if not properly supported, and that when he went to work the morning of his death he, with his assistant, examined the roof and it seemed all right. From this it is clear that, in continuing his mining and extending his room without propping, the plaintiff's intestate well knew and appreciated the danger, and he assumed the risk, and plaintiff cannot recover, although the defendant neglected to furnish the necessary props (see Sloss Iron & Steel Co. v. Knowles, 129 Ala. 414, 30 South. 584), unless the plaintiff's intestate had a right to rely upon the mine foreman's promise to furnish props and his assurance as to safety. This is not a case of a master's furnishing a defective appliance or place which he promises to have repaired or made safe, but is rather a case where assurance of safety was given to the servant who was making his own place to work which he knew as well as any one could know would be and was dangerous without using the appliances the master promised to furnish (and he knew that the master had not furnished them), and he well knew that in continuing to work therein he was in danger and was increasing the danger with every stroke of his pick, for he was an experienced miner and well knew of the necessity of propping his roof as he advanced. Surely, under these circumstances, the plaintiff's intestate had no right to rely on the promise to furnish props whether the furnishing was to be "to-day," "to-morrow," or "after a while as soon as I can."

And we think it equally clear, under the plaintiff's evidence most favorably considered, that the plaintiff's intestate had no right to rely upon the foreman's assurances that: "The top is all right." "Never mind, you go ahead. The top is all right"—because he was not only an experienced miner, but, as to the actual situation at the time the alleged assurance was given, he knew more about the situation than the foreman did, for he knew, and there is no suggestion in the evidence that the foreman knew, that he had already mined two or three days extending his roof (10 to 12 feet according to the average) without setting props, thus increasing the ordinary danger.

We conclude, on principles well supported in reason and well recognized in adjudged cases, that under the evidence, and as a matter of law, the plaintiff's intestate, in continuing to work in the mine in the absence of sufficient propping to support the roof in his room, assumed the risk of injury from the falling roof, and defendant was entitled to the peremptory charge in its favor. See Sloss Iron & Steel Co. v. Knowles, supra; Alteirac & West Pratt Coal Co. (Ala.) 49 South. 867; Coosa Manufacturing Co. v. Williams, 133 Ala. 606, 32 South. 232; Musser-Sauntry Co. v. Brown, 126 Fed. 141, 61 C. C. A. 207; Glenmont Lumber Co. v. Roy, 126 Fed. 524, 61 C. C. A. 506; Kansas City S. Railway Co. v. Billingslea, 116 Fed. 335, 54 C. C. A. 109; Bunt v. Sierra Butte Gold Mining Co., 138 U. S. 484, 11 Sup. Ct. 464, 34 L.

Ed. 1031; Eureka Co. v. Bass, Adm'r, 81 Ala. 214, 8 South. 216, 60 Am. Rep. 152; Bridges, Adm'r, v. Tennessee, C. & I. R. R. Co., 109 Ala. 293, 19 South. 495.

The judgment of the Circuit Court is reversed, and the cause is remanded, with instructions to award a new trial.

SHELBY, Circuit Judge (dissenting). The question of the deceased's contributory negligence was one for the jury, and, in my opinion. it was correctly submitted to the jury by the trial judge.

The court gave the last charge copied in the statement of the case in the opinion of the majority, but added the following explanation:

"Now I give you that in connection with the general charge, provided always if he (the deceased) stayed there in pursuance of a request, under the advice that it was safe, and didn't know, and that a person of ordinary prudence would not know, it was dangerous, then, in that event, if he knew it was dangerous he could not recover; otherwise he might."

In explanation of another charge requested by the defendant company, the trial court further said:

"If you should find that Mason was negligent in not furnishing these things. and told him the roof was safe, and that he stayed there, relying on it, and the danger of mining under those circumstances was not obvious and apparent to a reasonable man, then that might excuse him from contributory negligence; but otherwise it would not, because it is the duty of a man who has sufficient experience to know that mining in the way he was was dangerous without the props, * * * if it was an apparent and known danger he would not be justified in risking his safety on it. * * * But, as I explained to you several times, that depends upon whether the danger was obvious and apparent."

These instructions, in my opinion, correctly state the rule applicable to the case.

The reasons given by the trial court for overruling the motion for a new trial also shed light on the case as it was presented to the court and jury, and show that the question involved, to some extent, the credibility of the evidence, and was, therefore, one for the jury. Here is the order:

"The court has carefully considered the briefs of counsel, and the evidence in connection with the general charge. and the refused charges, and is of the opinion that the case was fairly submitted to the jury, and that a new trial ought not to be granted. It is true Salvador Lavito testified that Mr. Mason said 'Go to work. and to-morrow I will send you the timber,' etc., and that Immodino testified that Mason said, 'Go on to work, and I will send you the timber to-day.' Joe Thomasino, when asked what the deceased said to Mr. Mason about furnishing him the props, testified, in substance, 'after awhile, or as soon as I can, I will send you the props.' and then the deceased went back to work, and he asked the driver for the props, and he did not have them. The testimony of Mr. Mason did not impress the jury, and the jury might well have found, under the circumstances, that the deceased had a right to rely upon the promise to furnish the props as soon as the defendant could. and to wait a reasonable time therefor, which reasonable time the jury, under all the circumstances, found included the period in which the accident occurred. The several versions of the promises were before the jury, and it was for the jury to say which version was true. It is therefore considered that the motion for a new trial be denied and overruled, and that the defendant have 90 days from this date in which to prepare and present a bill of exceptions. This 26th day of May, 1909. Thos. G. Jones, U. S. Judge."

.. The view of the trial judge that the deceased had the right to rely on the promise of the master to furnish the props, and to continue to work, waiting a reasonable time therefor, is fully sustained by the authorities, as is, also, his conclusion that the question of reasonable time was one for the jury. 1 Labatt on Master & Servant, § 429, p. 1213, and cases cited in note 5; Dresser on Employers' Liability, § 115, p. 591, and cases cited; C., N. O. & T. P. Ry. Co. v. Robertson, 139 Fed. 519, 71 C. C. A. 335 (opinion by Lurton, Circuit Judge).

I cannot concur in the conclusion that the deceased servant, as matter of law, assumed the risk of injury from the falling roof of the mine; the master having negligently failed to furnish the props. A risk which the master negligently created by omitting some precaution which, in the exercise of ordinary care, ought to have been taken, cannot be regarded as one of the ordinary risks of the employment which the servant, as matter of law, is presumed to have assumed. This principle "has been formulated and applied so frequently as to have become axiomatic." 1 Labatt on Master & Servant, § 270; Ford v. Fitchburg R. R. Co., 110 Mass. 240, 14 Am. Rep. 598. This view has the approval of the Supreme Court. In Hough v. Railway Company, 100 U. S. 213, 25 L. Ed. 612, that court held that it is implied in the contract of service "that the master shall supply the physical means and agencies for the conduct of his business. It is also implied, and public policy requires, that in selecting such means he shall not be wanting in proper care. His negligence in that regard is not a hazard usually or necessarily attendant upon the business. Nor is it one which the servant, in legal contemplation, is presumed to risk.  *  *  * "

The conclusion of the court in the opinion just read can only be sustained on the theory that the danger was so obvious that a person of ordinary prudence would not have continued the work. I find nothing in the record showing that it was apparent and obvious that the roof of the mine was about to fall. It is to be presumed that the jury, as instructed by the trial judge, would have found for the defendant if such had been the fact. On the contrary, there is much to show that the danger did not appear to be imminent. It is not reasonable that Mason would have pronounced it safe and instructed the deceased to continue work if the danger had been obvious; and, besides, the instinct of self-preservation is to be considered and weighed against the supposition that the deceased incurred obvious and plain peril. The question was clearly one for the jury. Kreigh v. Westinghouse & Co., 214 U. S. 249, 29 Sup. Ct. 619, 53 L. Ed. 984.

I dissent from the opinion and the judgment of reversal.