## DANIEL F. SLATTERY *vs.* WALKER AND PRATT MANU-FACTURING COMPANY.

Middlesex.    January 11, 1901. — June 18, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

*Negligence*, Employers' Liability, Duty to provide safe appliances, Assumption of risk, Plaintiff's due care.

The proprietor of a factory is liable to an employee injured by an accident, caused by the breaking of the check valve of a hoisting machine, due to the act of the defendant's superintendent in negligently substituting an insufficient valve for the one which came with the machine.

A superintendent in a factory changed the check valve of an oil governed air hoist, taking out the half inch valve that had come with it and inserting in its place a three quarters inch valve, which was guaranteed by its manufacturer to stand a pressure of three or four hundred pounds per square inch. If the whole air pressure of the hoist was turned on without a load being attached to the piston rod, the pressure would be from twenty-seven to twenty-eight hundred pounds per square inch. In about two weeks this valve split, and the superintendent replaced it by another three quarters inch valve of the same kind. He did this without ascertaining how much pressure the new valve would stand or how much it might be subjected to when the hoist was in use. He testified, that he did not consider himself an expert mechanic, and thought the preceding valve split because it had some flaw or defect in it. About ten weeks later, when the plaintiff was about to hook a load on the hoist, he was injured by an accident caused by the new valve splitting in the same way that the preceding one had done. The defendant showed, that the plaintiff had been told never to turn on the whole air pressure when no load was attached, and not to turn on any air pressure at all until it was needed to lift a load, but it appeared, that the only practical way of hooking on a load was to start the hoist slowly rising and to hook on the load as it ascended, that this required an opening of the air valve, that the apparatus in an oil governed air hoist prevents the operator from knowing immediately on opening the air valve how much air pressure has been turned on, and that in operating such a hoist it might happen that the whole pressure was on, without the operator necessarily having made an unreasonable use of the machine. The plaintiff testified, that he did not know whether he had the full head of air pressure on at the time of the accident or not though he "probably" did have it on. *Held*, that these facts would warrant a finding that the defendant did not use due care in furnishing a safe hoist. *Held, also*, that the plaintiff did not assume the risk of the accident, that he was not chargeable with knowledge that the defendant's superintendent had substituted a three quarters inch check valve, not designed to stand the pressure to which it might be subjected, and had never taken the risk of such a hoist. *Held, also*, that the jury were warranted in finding that the plaintiff was in the exercise of due care.

TORT by a moulder employed in the defendant's factory for injuries received while operating a Ridgway oil governed air

hoist, the first count of the declaration alleging a defect in machinery under St. 1887, c. 270, and the second count being at common law.  Writ dated October 11, 1899.

At the trial in the Superior Court, before *Gaskill*, J., it appeared that the plaintiff was forty-five years of age, that he had been a moulder by trade for twenty-eight years before the accident, and that he had been employed by the defendant as a moulder from 1872 to 1879, and again from 1884 until the time of his accident, which occurred on April 21, 1899; that he was employed in the heavy moulding work, and that at the time of the accident he was preparing to lift what he called the top box, weighing about four hundred pounds; that in order to lift this load by means of the hoist it was necessary for him to fasten two iron hooks which were attached to the piston rod of the hoist on to two knobs or projections on the box made for this purpose, which in the factory were usually called "trunnions"; that he had put one hook in place and was holding the other hook in his left hand and was about to hook it to the load when the piston rod of the hoist shot or jumped suddenly into the air; that the hook in his left hand caught him in the left wrist and caused the injury for which he brought this suit; that the air pressure was turned on by him and that the piston rod and the hook in his left hand were both slowly rising when he was attempting to fasten the second hook to the load to be lifted.

It appeared that the accident was caused by the splitting of a check valve, which had been placed in the machine by one Inslee, the assistant superintendent of the defendant's works at Watertown, who had charge of the mechanical department of the works.  The evidence, in regard to this and all other material facts, is stated in the opinion of the court.

At the conclusion of the evidence, the defendant asked the judge to direct a verdict for the defendant.  The judge refused to do so, but instructed the jury that the plaintiff could not recover upon the first count, based on the employers' liability act. The judge gave full instructions, to which no exceptions were taken, the only exception being to the refusal of the judge to direct a verdict for the defendant.

The jury returned a verdict for the plaintiff in the sum of $6,500; and the defendant alleged exceptions.

*C. Reno*, for the defendant.

*G. L. Mayberry*, for the plaintiff.

LORING, J.   There was evidence that the defendant was negligent in undertaking to improve the hoist by substituting a three quarters inch check valve for the one half inch check valve used in the original construction of the hoist.

The defendant had put one Inslee in "charge of the mechanical department of the defendant's works," including the machine in question. _Inslee testified that he noticed that this hoist would sometimes give a jerk when the piston rod was being lowered with the load attached, and that "in order to prevent or remedy this jerking," he had ordered the one half inch Pratt and Cady check valve which came with the hoist removed from the hoist and had had inserted in its place a three quarters inch Pratt and Cady check valve; that, after this substitution was made, the hoist ran "more smoothly and without such jerks as it had previously given," for about two weeks, when one morning "he heard a report," and the piston went up and struck the top of the cylinder. It was found that the three quarters inch valve was split. It appeared that at this time the air pressure was turned on and that there was no load on the hoist. Inslee then put a new valve of the same kind and size on the hoist, and, ten weeks later, the accident in question happened.

It is plain that the defendant company is liable for Inslee's negligence, if he was negligent, in making this change in the hoist. *Ford* v. *Fitchburg Railroad*, 110 Mass. 240. *Moynihan* v. *Hills Co.* 146 Mass. 586.

It appeared that Inslee "had no degree as a mechanical engineer," and did not claim to be one; but had done the work of superintending and looking after machinery at three different places where he had been employed before he entered the defendant's employment. He testified that "he did not consider himself to be an expert mechanic; that he had never made machinery and had never made a hoist nor seen one made." He further testified that when he substituted the three quarters inch for the one half inch valve, he did not know how much pressure would come on the valve, but "had learned since the accident that it was twenty-seven to twenty-eight hundred pounds per square inch"; and that "before putting on the valve in question

he did not take any steps to ascertain what pressure it would have to stand, and did not make any test of this valve"; and that "he had heard that the manufacturers of these valves only guaranteed them to stand a pressure of three hundred or four hundred pounds per square inch."

It appeared from the testimony of another witness that he had tested six three quarters inch check valves of the same make as that in question, and that two of the six had not stood the pressure of twenty-seven hundred to twenty-eight hundred pounds per square inch; that one of the six split when subjected to a pressure of twenty-two hundred and seventy-five pounds, and the other, when subjected to a pressure of twenty-six hundred pounds. There was also evidence that the three quarters inch valve which was in the hoist at the time of the accident in question was split in the same way that the first three quarters inch valve was split, ten weeks before. It is manifest that the larger the diameter of the check valve, the less the pressure it would resist, unless it was made proportionately stronger, and there was no evidence that the three quarters inch check valve was made stronger in proportion than the one half inch check valve.

This, then, was a case where the superintendent undertook to substitute a three quarters inch check valve for the one half inch check valve used in the original construction of the hoist, without ascertaining how much pressure the new valve would stand or how much it would, or might, be subjected to when the hoist was in use; and where the new valve split when the air was turned on without a load being attached; and thereupon, a second three quarters inch valve of the same kind was put in, without inquiry being made as to the pressure it would stand or as to the pressure it would be subjected to, and the second valve split as the first did; and finally, where it turns out that these three quarters inch valves were only guaranteed to stand a pressure of three hundred or four hundred pounds to the square inch, while they might be subjected to twenty-seven or twenty-eight hundred pounds per square inch in the hoist where they were put by the defendant, if it happened that the whole air pressure was turned on without the load being attached; and where it also turns out that two of six similar valves when tested did not stand that pressure. This would warrant a finding that the

defendant did not use due care in furnishing a safe hoist.   See in this connection *Moynihan* v. *Hills Co.* 146 Mass. 586.

The defendant seeks to meet this by showing that the plaintiff had been told never to turn on the whole air pressure when no load was attached, and not to turn on any air pressure at all until it was needed to lift a load.   But it appeared that in the case of a Ridgway oil governed air hoist, " even if the air valve was left open only a little way, the full head of air pressure would accumulate in the hoist in a short time; that the amount of pressure exerted by the compressed air upon the piston depended upon how long the air valve was left open and upon how wide it was open, and that the piston would receive the full pressure from a small opening in the air valve, if this valve was left open long enough."   And the plaintiff testified that the only practical way of hooking on the load to the hoist was to start the hoist rising slowly, and to place the hooks on the " trunnions " of the box containing the load as it ascended.

We are of opinion that the plaintiff did not assume the risk of the accident which happened to him.   He was not chargeable with knowledge that the defendant's superintendent had substituted a three quarters inch check valve, which was not designed to stand the pressure to which it might be subjected in the use of the hoist, and he had never taken the risk of such a hoist.

We also think that the jury were warranted in finding that the plaintiff was in the exercise of due care.   There was evidence that the only practical way of hooking the hoist on to the trunnions was to start the hoist up, and that an oil governed hoist does not respond directly and in proportion to the extent to which the air valve is opened, but that the amount of pressure may also depend upon the length of time the air valve has been partially open.   This, coupled with the plaintiff's testimony that he did not know whether he had the full head of air pressure on at the time or not, though he " probably " did have it on, warranted a finding that he was in the exercise of due care.

The case does not come within the doctrine applied in *Coleman* v. *Mechanics' Iron Foundry Co.* 168 Mass. 254, 257, that an employer is " not obliged to provide an implement for an improper or unreasonable use."   It is evident from what has been said that the apparatus in a Ridgway oil governed air hoist prevents the

operator's knowing, immediately on opening the air valve, how much air pressure has been turned on, and, for that reason, we think it possible that in operating such a hoist it might happen that the whole air pressure was on, without the operator having necessarily made an unreasonable use of the hoist.

The defendant's next defence is that it performed its whole duty to the plaintiff when it purchased a check valve from a reputable manufacturer, within the rule applied in *Reynolds* v. *Merchants' Woolen Co.* 168 Mass. 501, and *Fuller* v. *New York, New Haven, & Hartford Railroad,* 175 Mass. 424. To make that rule applicable, the defendant had to take the further step of proving that the valve was made for the use to which it had been put by it; but, in place of that being the fact, it appeared that the maker of the hoist had used a one half inch valve when he constructed it, and that the maker of the three quarters inch valve only guaranteed it to stand a pressure of three hundred to four hundred pounds, while the defendant used it where it might be exposed to a pressure of twenty-seven hundred to twenty-eight hundred pounds.

*Exceptions overruled.*