# Tobler *v.* Pioneer Mining & Mfg. Co.

### *Personal Injury Action by Employe.*

(Decided Dec. 21, 1909.   Rehearing denied Feb. 26, 1910.
52 South. 86.)

1. *Master and Servant; Injury to Servant; Employer's Liability Act; Complaint; Evidence.*—Where a complaint is drawn under the Employer's Liability Act for the death of an employe on account of a defect in the ways, works, etc., and alleges several defects conjunctively, it becomes necessary to prove all the defects alleged.

2. *Same; Safe Place to Work.*—The duties of a master to a servant in preparing materials to construct or repair the ways, works, etc., of the master, and putting the same in suitable condition for use are not the same as those he owes to a servant using such ways, works and machinery after the construction or repairs are complete.

3. *Same; Assumption of Risk.*—A servant constructing or repairing the ways, works and machinery of a plant of the master assumes the risk obviously incident to the work and cannot complain that the ways, works and machinery are defective when the defect is the cause of his being at work.

4. *Same; Negligence.*—The fact that a master has failed to provide means to avoid injury to a servant does not make him liable to the servant in the absence of proof of negligence.

5. *Same; Safe Place to Work.*—When a master does everything that the law requires him to do to conserve the safety of his employes, he is not liable for any risk incident to the employment.

6. *Same; Negligence.*—Where the master had provided another way for employes to take to reach the top of a furnace being repaired and the servant rode on a car on an inclined tramway to the top of the furnace and there was no defect in the engine, tramway or car, but the rails at the top of the furnace had been removed in order to make repairs, and the car was dumped into the furnace, killing the employe, the master was, as a matter of law, free from actionable negligence proximately causing the injury; notwithstanding that stop-blocks could have been erected to prevent the car from dumping into the furnace, and that the engineer employed to operate the engine could have stopped the car at any place on the incline, it appearing that at the time of the accident, a stranger was operating the engine and failed to stop the car.

7. *Same; Act of Independent Third Person.*—The wrongful act of a third person, not actually intended or reasonably to be expected by the master, causing injury to a servant is not the result of the master's wrong, and hence, the master is not liable.

8. *Same; Negligence of Third Person.*—A servant operating the engine pulling cars up a tramway to the top of the furnace is not guilty of culpable negligence in allowing strangers to go into the

[Tobler v. Pioneer Mining & Mfg. Co.]

engine room, since he could not reasonably anticipate that they would meddle with the machinery while there, and attempt to operate a car on the incline, and the master need not anticipate such meddling.

9. *Same; Fellow Servants.*—An injury to a servant resulting from the negligence of a fellow servant not within the line of the employment or within the Employer's Liability Act does not render the master liable.

10. *Negligence; Actionable Negligence; Proximate Cause.*—To constitute actionable negligence there must be not only causal connection between the negligenec complained of and the injury suffered, but the connection must be by a natural and unbroken sequence without intervening efficient cause so that but for the negligence complained of the injury would not have occurred; in other words, the negligence complained of must be the direct, immediate, efficient cause of the injury.

11. *Appeal and Error; Harmless Error; Instructions.*—Where the general affirmative charge was properly given for the defendant, the error, if any, in the manner in which it was given, or in any other charge, was without injury.

12. *Charge of Court; Directing Verdict.*—It is the exclusive province of the court to determine all questions of law arising on the trial, and where the evidence affirmatively disproved one or more of the material averments of every count in the complaint, the affirmative charge is properly given for the defendant; but, if the evidence is conflicting, or where there is any evidence tending to prove a fact however slight, the issue should be submitted to the jury; or if plaintiff's evidence does not tend to prove a cause of action, the court may refuse to hear evidence of the defendant, and if properly requested, may direct the verdict for the defendant.

13. *Same.*—The court should not leave a question to the jury in respect to which there is no evidence, and where the facts are undisputed and the evidence with all the inferences which may rightfully be drawn therefrom does not establish the cause of action, the court must on request so instruct the jury.

14. *Same.*—If the court would sustain demurrer to the evidence it is proper to give the affirmative instruction for the party who can interpose such demurrer.

(McClellan and Sayre, JJ., dissenting.)

APPEAL from Birmingham City Court.

Heard before Hon. C. C. NESMITH.

Action by Mary Tobler as administratrix against the Pioneer Mining & Manufacturing Company, for damages for the death of her intestate, an employe of the defendant. Judgment for defendant on a directed verdict, and plantiff appeals. Affirmed.

Statement of facts by the court.

This was an action by the personal representative of a deceased servant against the master under the employer's liability act to recover damages for the injury which resulted in the death of the servant. The action is brought under sections 1751 and 1749 of the Code of 1896, commonly known as the "Employer's Liability Act."

The complaint consisted of 16 counts, some of which were added and amended at various times while the action was pending in the lower court. Various demurrers were filed by the defendant to the original complaint and as it was amended from time to time. The demurrers were overruled to some of the counts and sustained as to others. To the complaint as last amended the defendant filed several pleas; the general issue and to some of the counts special pleas of contributory negligence. It is not certain from an examination of the minute entries and judgments as shown by this transcrpt the precise issues upon which the trial was finally had. This uncertainty was probably occasioned, as stated by counsel for appellant in their brief, by two or three judges ruling upon the pleadings at different times, and because of the great length of time the case had been pending in the lower court. It is, however, stated by counsel for appellant and appellee that for the purpose of this appeal it must be taken that the trial was had upon the plea of general issue to all 16 counts of the complaint with the exception of 2, to wit, the thirteenth and fourteenth counts, and also upon the special pleas of contributory negligence as shown by the record as to all counts except those which declared upon wanton negligence or willful injury.

After the introduction of all the evidence, the court, at the request of the defendant, gave the general affirmative charge with the hypothesis "if the jury believe

the evidence," and refused quite a number of written charges requested by the plaintiff. The jury retired,. and notwithstanding this affirmative charge for the defendant with the hypothesis brought in a verdict for the plaintiff, which was read in open court by the clerk of the court, and the court upon the motion of the defendant refused to receive the verdict after it was read,. and proceeded again to charge the jury that they must find a verdict for the defendant, and sent them back to the jury room, to which action of the court the plaintiff objected and excepted. Later, the jury returned another verdict: "For the defendant according to instructions from the court." The court then entered up a judgment for the defendant, from which the plaintiff appeals, and assigns various errors as to the rulings of the court upon the pleadings and evidence which were adverse to the plaintiff.

It therefore clearly appears that the prime and pivotal question to be determined on this appeal is whether or not the affirmative charge with the hypothesis and without the hypothesis could and should have been given by the trial court for the defendant. If this instruction by the court to the jury could and should have been given by the trial court with the admission of all the evidence which the plaintiff sought to introduce, and with the exclusion of all the evidence which he sought to exclude, then there could be no injury as to any other error complained of by him.

In determining whether or not there was error in the giving of the affirmative charge for the defendant, the following questions must be determined: (1) Was there evidence before the jury tending to prove, or from which the jury had a right to infer, the truth of every material averment of any one count of the complaint? (2) Did the evidence conclusively prove, without conflict

and without any legitimate adverse inference, from the evidence, any one or more of the pleas interposed by the defendant which were interposed as complete answers and defenses to every count of the complaint upon which issue was joined? If either one of these questions can be answered affirmatively, then the general affirmative charge was properly given for the defendant. If neither one of them can be answered affirmatively, then it was reversible error to give the charge.

The questions involved on this appeal are so important that it is probably well to set out one or more of the counts of the complaint in this opinion and to set out the substance of the evidence, as the court finds it upon the record, and which we may say is in the main practically conceded by counsel in their briefs.

The first count of the complaint was in words and figures as follows: "The plaintiff, Mary Schmidt, who sues as administratrix of Joseph Schmidt, deceased, claims of the defendant the Pioneer Mining & Manufacturing Company, a corporation, the sum of forty thousand ($40,000) dollars as damages, for that, whereas, on, to wit, the 6th day of March, 1899, the defendant was a corportion and owned and controlled a certain iron manufacturing plant, known as Thomas Furnaces, at Thomas, in Jefferson county, Ala., and it became and then was its duty to have and keep its said plant, ways, works, and machinery connected therewith in a reasonably safe condition, and to keep in its employ reasonably prudent and competent engineers, and other employes in and about the operation and control of its engine and other machinery in making repairs on its said work, and plaintiff avers that said deceased, Joseph Schmidt, was on said 6th day of March in the employment of the defendant as a mechanic under one

[Tobler v. Pioneer Mining & Mfg. Co.]

Thomas McLaughlin, defendant's foreman, and was employed in repairing one of the defendant's said furnaces, known as No. 1; that while he was so employed and in the discharge of his duties as such mechanic he received orders from McLaughlin to take certain tools and a piece of lumber to the top of said furnace; that in compliance with such order he took the required articles, and in company with one Brooks Hall, an employe of the defendant, got in the car of the incline railway, provided by the defendant for hauling material and men to the top of the furnace, and when they were safely seated in said car the said Hall gave the signal for the defendant's engineer in charge of the hoisting engine to draw them up, whereupon the defendant did then and there by its servants in charge of said hoisting engine carelessly and negligently hoist said car in such a manner that said car and plaintiff's intestate were dumped into the said furnace, and said deceased fell, to wit, 90 feet to the bottom of said furnace and was killed. To the damage of the plaintiff in the sum of forty thousand (40,000) dollars as aforesaid, wherefore she brings this suit."

The second and third counts adopted the words of the first count, down to and including the words "safely seated in said car."

The fourth and sixth counts adopted the words of the first count down to and including the words "as a mechanic."

The fifth count is for wanton negligence or willful injury, and avers that the defendant, by its servants who were making repairs on said furnace recklessly, willfully and wantonly dumped the said deceased into the said furnace and killed him.

The sixth count also declares upon wanton negligence or willful injury, in that the defendant by its ser-

vants recklessly, willfully, and wantonly ran said car to the top of the furnace and dumped said deceased into the furnace whereby he fell to the ground and was killed.

The seventh count of the complaint was in words and figures as follows: "Plaintiff, who sues as administratrix of Jacob Schmidt, deceased, claims of the defendant the sum of forty thousand ($40,000) dollars damages for that, whereas, on, to wit, the 6th day of March, 1899, the defendant was a corporation, and controlled and operated a certain iron manufacturing plant, known as the "Thomas Furnace," and situated at Thomas, Jefferson county, Ala., and it became and was its duty as such manufacturer to keep its ways, works, and machines or plants connected thereto, or used in its business as such manufacturer, in a reasonably safe condition while being operated or repaired, and that on said day the plaintiff's intestate was in the employ of the defendant as a mechanic, and while so in the defendant's employ and in the faithful discharge of his duties as such employe he was thrown from one of defendant's cars into its furnace and killed, and plaintiff avers that the death of said decedent was caused by the reason of a defective condition of defendant's works, ways, machines, or plant, in that, to wit, there was no chock or other good and sufficient means to stop said car provided, and the defective condition of such was known or by reasonable diligence could have been known to defendant or its servants who were intrusted by defendant with the duty to see that machinery, ways, works, and plant were kept in safe and proper condition, to the damage of the plaintiff in the sum of forty thousand dollars aforesaid, therefore she sues."

The eighth count with somewhat kindred preliminary averments to the others avers that decedent was killed by reason of the negligence of a person in the employ or service to whose orders or directions intestate was then and there bound to conform and did conform, and that his death resulted from his having so conformed.

The ninth count adopted the first count down to the words "safely seated in the car," and alleges that the death of decedent was caused by reason of the negligence of a person in the service or employ of defendant who had charge or control of the hoisting engine.

The tenth count adopted the first count down to the words "safely seated in the car," and avers that the defendant negligently allowed one Jim Doolittle, an ignorant and inexperienced and incompetent negro boy to take chargeg of its hoisting engine, and did negligently and carelessly hoist said car to the top of the furnace and dumped said deceased into the furnace and killed him, and that the death of deceased was caused by the negligence of one H. B. Kiser, its general manager, in charge of the furnace, who had superintendence intrusted to him, in that he allowed and intrusted the negro boy named to have control of the engine, etc

The eleventh count was as follows: "The plaintiff who sues as administratrix of Joseph Schmidt, deceased, claims of the defendant the sum of forty thousand ($40,000) dollars damages, for that, whereas, on, to wit, the 6th day of March, 1899, the defendant was a corporation, and as such controlled a certain iron manufacturing plant known as 'Thomas Furnace,' situated at Thomas, Jefferson County, Ala., and it became and was then and there its duty to keep in its employ a capable, competent, and careful superintendent and other employes, and to keep its said plant, ways, works, and machinery connected therewith in a reasonably safe

condition, and plaintiff avers that said deceased was on said date in the employment of said defendant as a mechanic, and while so employed, and in the discharge of his duty as said mechanic, was carelessly and negligently hoisted to the top of said furnace in one of defendant's cars and thrown into the furnace and killed, and plaintiff avers that the death of said decedent was caused by reason of the act or omission of the person in the employ or service of the defendant, whose name plaintiff does not know, done or made in obedience to the rules and regulations or by-laws of defendant, or in obedience to instructions given by persons delegated by the authority of the defendant in that behalf, in this, that he allowed one Jim Doolittle, an incapable and ignorant negro boy to have control of its hoisting engine and said tram car, by reason whereof said deceased was killed as aforesaid to the damage of the plaintiff in the sum of forty thousand dollars, wherefore she sues."

The twelfth count contained similar averments to the eleventh, and alleged that the injury was due to the negligence of a person in the employment of the defendant, whose name was unknown and who had superintendence intrusted to him, and while in the exercise of it that the engine was left unattended by any one capable of controlling it.

The thirteenth and fourteenth counts were eliminated.

The fifteenth count adopted the seventh count down to and including the words "the death of said decedent was caused," and alleges that the injury was the proximate consequence of the negligence of a person whose name was unknown, who was in the service of the defendant and who was intrusted with superintendence, and, while in the exercise of it, negligently caused plain-

[Tobler v. Pioneer Mining & Mfg. Co.]

tiff's intestate to be carried upon said car to the top of the furnace when it was highly dangerous, etc.

The sixteenth count adopted the seventh count down to and including the words "as such employe," and alleged the accident and death of the intestate, etc., and averred that the intestate was dumped or caused to fall into the furnace by the defendant wantonly and willfully in the following manner that the person in the service or employment of defendant intrusted by it with superintendence, whose name was unknown, while in the exercise of the superintendence, knowing that the engine was in the control of a careless and unskillful person, and knowing that the track and dumping apparatus across the top of the furnace had been removed, and knowing that there was not sufficient chock or sufficient appliances to prevent the car from dumping into the furnace, and knowing that to cause the deceased to be transported to the top of the furnace by means of the car and engine would probably result in his death, nevertheless willfully or wantonly or intentionally, with knowledge as aforesaid, caused the plaintiff's intestate to be transported to the top of the furnace by means of the car operated by the engine.

The general issue was filed to each of these counts, and special pleas, setting up contributory negligence and assumption of risk, seem to have been allowed to all the counts except those which declare on wanton negligence or willful injury.

Without setting out the evidence in detail in this opinion, but to set out the substance and effect as far as we may in reasonable space, and which in the main as we have stated is conceded by both counsel for appellant and appellee in their briefs, it is as follows:

The defendant for several years before and at the time of the injury was operating an iron furnace plant

near Birmingham, known as "Thomas Furnace" at Thomas, Ala., and plaintiff's intestate several years prior thereto and at the time of the injury was in the employ of defendant as boss carpenter. One of the furnaces known as No. 1, which was the scene of the accident and injury complained of, was at the time of the injury out of blast and was being repaired, which was the work upon which the defendant's agents or servants were engaged at the time of the injury and upon whose negligence or wrongful acts the suit is based. The furnace was about 80 feet high and there was constructed at the furnace an incline rail or tramway from the ground to the top of the furnace, which was about 150 feet in length, along which cars were drawn primarily for the purpose of carrying iron ore, coke, and other material to the top of the furnace when it was in operation. The tram cars were carried up this incline track by means of a pusher called a "monkey" which was operated by a wire rope, and which caught the car behind and pushed it up. The apparatus was run by means of an engine located upon the ground near the furnace, but the cars and machinery for running them were controlled by means of levers, and a station for the person operating the cars was in the little room or house at the top of the furnace called a "doghouse." It appeared also that it was the custom for the employes of the defendant to ride up and down that incline on the cars. There was also evidence that notices were posted about the yards, and at the end of the incline, forbidding persons from riding up and down the incline or from trespassing. Some of the witnesses were unable to give the exact language of the notices; some said that the notices in effect prevented any person from riding up and down the incline on the cars, and others that the notices limited them only to cars called "filling cars," or

[Tobler v. Pioneer Mining & Mfg. Co.]

"pushers," and that the car that intestate was riding upon at the time of the injury was a "duct car." The evidence also showed that there was a stairway running up from the ground to the top of the furnace parallel to the railway which was intended and was used by persons to go up and down in going from the ground to the top of the furnace or in descending from the top of the furnace to the ground, but that a number of employes at different times would ride up and down the incline on the cars notwithstanding the notices. At the time of the injury the framework over the top of the furnace and a part of the furnace called the bell, which was hung to the framework and suspended in the furnace, had been removed preparatory to relining the furnace and the employes or agents of the defendant at the time of the injury were engaged in taking out the fire brick which constituted the lining of the furnace and preparing to reline the furnace. When the furnace was in operation and running the railway upon which the cars were operated ran up to the top of the furnace and then ran horizontally across the top of the furnace; that the track across the top of the furnace is laid on beams; that a part of the track across the top of the furnace and beams upon which it rested were removed at the time of the injury and were removed for the purpose of relining the furnace, and that after they were so removed there was nothing to prevent the car which run up the incline to the top from being dumped into the furnace, which could not happen if the beams and track thereon had been in their normal or usual condition as they were when the furnace was in operation. It also appeared that if a strong chock block or obstruction had been built across the upper end of the incline track that the cars could have been prevented from dumping off from the top and end of the incline into the furnace as this one did on the occasion of the injury.

The morning on which the accident and injury happened was cold, some of the witneses say that it was sleeting or snowing, and that a fire had been built in the doghouse and that a half dozen or more negroes had gone in there to warm. The defendant's general foreman, McLaughlin and the boss James Moore, and the regular hostler who operated the incline railway, whose name was Mylam, were at the top of the furnace; that the foreman and boss had gone down into the furnace to make some observations and to take some measurements relative to the scaffolding necessary to relining the furnace, and that Mylam was at the very top of the furnace, having lowered McLaughlin and Moore into the furnace and at the very moment of the injury was lowering a light to them; that while McLaughlin and Moore were in the furnace, McLaughlin sent a negro named Brooks Hall with a message or directions to get some tools, a plank or something of the kind from the carpenter's shop or carpenter. The exact nature or wording of this message or direction by McLaughlin to the negro is not certain. Mylam who was plaintiff's witness, testified that he heard McLaughlin tell Brooks he wanted a square, saw, and a piece of plank, or something of the kind, and to go down to the carpenter's shop and tell the carpenter; that he did not understand exactly what McLaughlin said, but he said tell the carpenter, or the carpenter's shop, and the negro went away for it. The witness Moore testified that McLaughlin hollered up for a strip and square, and that these things were kept at the carpenter's shop for them, and that Mr. Schmidt the intestate had charge of the carpenter's shop. After the negro Brooks had gone on this errand McLaughlin called for a lamp and Mylam had gotten the lamp, lighted it and at the very time of the injury was lowering it down into the furnace. The

last Mylam saw of Brooks was when he was going on
the errand, he was going toward the entrance to the
steps which led down from the top of the furnace. He
saw nothing more of Brooks nor the intestate until he
heard the car rolling close by him and he was lowering
the lamp, that before he could raise up the car went
into the furnace. So far as the evidence shows, at the
time the car went into the furnace with intestate was
the only time that the car had brought any one up to
the top of the furnace that day. It also appeared that
Mylam was the only person that morning that had the
right to run the hoisting engine or had any duty in con-
nection with it, and that he at the time hoisted up all
the material that was needed to be hoisted. It did not
appear that any of the persons in the doghouse at the
time of the injury had any duty to perform in hoisting
or that they had any right to hoist it, so far as the evi-
dence shows. The only purpose of their being in there
was to warm. It does not appear at this time that the
hoister had any helper or assistant, neither he nor any
one else seem to know who hoisted the car; at least,
there was no evidence tending to show that any one of
them hoisted it. There was some evidence to show that
the negro Jim Doolittle had upon some past time hoist-
ed the car, and that therefore he had some knowledge
as to the mode of operating it. There was no evidence
to show from which the jury or any one else could infer
who moved the lever and hoisted the car at the time.
The hoister Mylam is conclusively shown not to have
done it and not to have given any orders for any one
else to hoist the car, and it is conclusively shown by the
plaintiff's own evidence that he had no knowledge that
it was being hoisted or that it would be hoisted. It also
was shown that if the car happened to be at the bottom
when employes of the company were going up, and that

he was at the time hoisting or lowering the car, they would sometimes get into the car and go up; if not, they would go up the steps; that they never waited for the car like they would for a street car, but they did often come up that way. It does not clearly appear when or where the negro Brooks and the intestate got into the car, but under all the evidence it appears that they could only have done so at the foot of the incline, and that if they did, they did so when the hoisting engineer was engaged in lowering the lamp into the furnace, and that if the car was run to the top by any one it was done so by some person in the doghouse, who was shown to have no right or duty to hoist the car. The car, instead of being stopped at the top of the furnace as it could easily have been done if properly operated by a competent and careful person, was allowed to run to the end of the tram and dumped into the furnace, killing plaintiff's intestate.

It also appeared as stated above, that the tracks across the top of the furnace as they were used when the furnace was being operated could have been replaced while repair upon the furnace was going on, but that it would have required a good deal of labor and trouble, and that the track was not needed on top of the furnace except for dumping raw material into the furnace when it was in operation. It also appeared that if the track had been across the top of the furnace the car could not have been dumped into it, or that if sufficient chocks or deadmen had been placed at the top across the top of the furnace it could not have dumped in. It was also shown in the evidence that the repairs on the furnace were about to reach a stage when the carpenter would be needed to cut and fit the timbers for the scaffolding, but that this work was and could be done in the carpenter's shop, situated a few hundred feet from the base

of the furnace. The top of the furnace had been off for four or five lays; during that time some of the employes had ridden up and down the incline on the car, while others had gone up and down the steps, but so far as the evidence showed, upon every occasion on which people had gone up and down the incline during the time the furnace was being repaired, the cars were operated by the hoister, Mylam. The evidence also showed that it was dangerous to ride upon the cars going up and down this incline, and that it required a man of skill and caution to operate it, but that such operator could stop the car quickly at any time or place desired. That it could not be operated faster than a speed of six miles per hour, but that the speed could be regulated to any velocity less than that. The evidence was somewhat in conflict as to whether or not on the occasion one standing at the foot of the incline could tell the condition of the track at the top of the furnace, or could tell who was operating the car, on account of the distance, the condition of the weather, etc. The evidence did not show whether or not the intestate had been upon the top of the furnace since the top was taken off, or that he knew of its condition, or that he had or would have anything to do with repairing the furnace other than cutting the timbers necessary for making the scaffolding.

It is contended by counsel for appellant in their brief the the evidence showed that when Brooks and intestate returned to the foot of the incline and took a seat in the little dust car which was standing at the bottom, having in their possession the articles wanted, some one in the doghouse then moved the lever which started the car up the incline and failed to stop it before reacing a point where the track was removed, and the car went over into the furnace, etc. The evidence

32—166

has been carefully examined time and time again, and we are unable to find any evidence of any person which showed that the plaintiff's intestate and the negro Brooks came to the foot of the incline and took a seat in the little dust car which was then standing at the bottom, and that some one in the doghouse then moved the lever which started the car up the incline. The plaintiff's witness Mylam certainly did not testify to these facts for the reason that the first he saw of the intestate and the negro Brooks after the negro left the top of the furnace to go on the errand was the very moment the car went over the top of the furnace. He did not see them get into the car, nor know of their approach until they were within a few feet of where the car dumped into the furnace. Plaintiff's witness Monroe did not and could not testify to such fact for the reason that he testified that he was not on the furnace when Mr. Schmidt got hurt. He did not witness the accident nor did he attempt to define or describe the time or the mode in which the intestate and Brooks got into the car, how or by whom they were elevated. Neither did the witness Derrick, because he did not claim to be at Thomas at the time of the injury; neither did Mrs. Tobler testify to any such facts because she was not present on the occasion; nor did or could the witness Moore testify to such facts, because he was down in the furnace at the time, and of course could not have witnessed it. So it is certain that there was no evidence showing or tending to show these facts. The only evidence that the intestate had the articles— saw, piece of plank, or something of the kind, with him at the time of the injury as claimed by counsel for appellant—is that they were found at the bottom of the furnace after the accident. This was substantially all the evidence as to the material facts. Of course there

was evidence as to details, but which are immaterial, and which could not add to or take from the right of the plaintiff to recover in this action.

It will be observed that there was no evidence whatever showing or tending to show that the plaintiff's intestate was requested, ordered, or directed by any one of the defendant's servants, or for that matter by any one, to get into the car, or to go to the top of the furnace at the time or on the occasion of the injury. His presence there, so far as the evidence shows, was wholly gratuitous. The most that could be said to be shown to justify his presence there was that he was the boss carpenter, and may or may not have had occasion to go to the top of the furnace at the time he was injured— that is, the evidence is sufficient to show that he was not a trespasser at the time of the injury; that is to say, the evidence on the other hand shows that the measurements of the furnace were made by others, and were in fact being made at the very time of the injury, and that the carpenter's work, or especially that to be done by the plaintiff's intestate, would be done in the shop and not at the top of the furnace. It may be that he had a right to be there at the time or on the occasion of the injury, but the evidence does not show it, nor does it show any facts from which the jury might reasonably infer that he was there by the direction of the defendant or any of its agents or servants. The most that can be said to be shown by the evidence in this connection was that the orders or directions given to the negro were that he go to the carpenter or carpenter's shop and get those tools and plank. No one contends that McLaughlin sent for the carpenter; the most that could be inferred was that he directed the carpenter to send those articles by the negro who was sent on the errand. There is likewise no evidence showing or tend-

ing to show who operated the lever that propelled the car to the top of the furnace at the time of the injury, except that it was some one of a half dozen persons, neither of whom had any right or duty to operate it, and if they did so they did it without any directions or instructions from the defendant or any of its agents authorized to give such directions or instructions, and without the knowledge or consent of the defendant or any of its agents so authorized. It must be remembered that the plaintiff's own evidence, coming from her own witnesses, showing affirmatively and conclusively that whoever operated the engine on the occasion which hurled the plaintiff's intestate to the bottom of the furnace and caused the injury complained of, did so without any authority or instructions from the defendant or any of its agents authorized to give authority or instructions, and that they did it without any right or duty. The witness Mylam, who was the first witness introduced by plaintiff, was the only witness examined who saw any part of the accident, or could have seen or witnessed it. The other witnesses were either not present, or were down in the furnace and could not have witnessed it. His evidence, to give his own words, relating to the accident was as follows: "I had been up there 15 or 20 minutes when this accident happened; I was always there on time, and it was just after six a little. It was my business to do all the hoisting there was to do there, what I was employed for was to run that engine. I operated it from the little iron house I was speaking of at the top that was built right off to one side of the incline where the incline reaches the top. * * * I cannot say positively, but it is my recollection, I had not pulled any cars up that morning up to this time. I have pulled people up and down on this car I cannot say how often, frequently some mornings

—frequent. I cannot say positively whether or not I had moved that car that morning, nor can I state whether any other person had moved it that morning. If they did I did not know it." It therefore clearly appears that the plaintiff's own witness Mylam was the person intrusted to operate this engine, and that he did not operate it on this occasion, and that he did not authorize any one else to operate it, and so far as he knows the car had not been moved that day before the accident. The witness further said, when this accident happened, he was lying down at the time reaching a lamp—lowering a lamp—down to the boss down on the scaffold, "I had just let the men down in the furnace by means of a rope, and then they called for a lamp, and I lighted the lamp, and tied it to a small rope, and was lying down at the rim of the furnace where I could reach over. I saw the car just as it made the leap, just as I heard it come by I turned and looked, and it made a leap. I do not know who pulled the car up. The engine room was full of negroes and I do not know who was in there. There was no racket, but I heard the car rolling right close to me, and I looked around, and before I could raise up it went into the furnace. It was at the top when I first heard it right about where it ought to stop." The witness further testified that during the four or five days when the top of the furnace was out he had pulled people up and down the incline, that he did not know of anybody else doing so during that time until this accident happened. He further says that: "I hoisted up all the material that day that needed to be hoisted. I do not know whether any one else gave any orders, that was a portion of my job at this particular time, I had other duties. While they were repairing the furnace and when it was not in operation, it was not necessary to hoist the car up and down

nearly so often as when it was in operation. We had to bring up tools and material for repairs, to lower down all the stuff removed from the top." This was the plaintiff's own witness, and the only witness who attempted to testify as to how the injury occurred.

L. C. DICKEY, and JAMES A. MITCHELL, and JOHN F. GILLESPIE, for appellant. Counsel discuss the objections and exceptions to evidence, but without citation of authority. The demurrers to the count must be treated as having been waived.—*Ala. Nat. Bank v. Hunt,* 125 Ala. 512 and cases cited. It was properly a question for the jury whether the servant was acting in the scope of his employment at the time of his injury. —Black's Pleading & Proof in Accident Cases, sec. 281. It was also a jury question as to whether the servant was aware of defects in the machinery, and knowingly incurred the risks or dangers.—Authorities supra and 63 Me. 455; 61 Pa. St. 58; 106 Mass. 282; *Clar v. Goddard,* 39 Ala. 164. Counsel cite numerous authorities in support of their proposition that the trial court is forbidden to give any expression of opinion as to the weight and sufficiency of the evidence. Counsel proceed to discuss the other charges refused, together with citation of authority.

PERCY & BENNERS, for appellee. Counsel discuss the evidence and the action of the court as to the charges at some length and arrive at the conclusion that under the pleading on the evidence adduced, the court properly directed the verdict, but cite no authority in support of their contention.

MAYFIELD, J.—We will now apply this evidence to this case, and see if it tended to prove, or if it author-

ized the jury to infer, the truth of every material aver-
ment of any one count of the complaint. If so, the giv-
ing of the general affirmative charge in this case was
error.

The first count, among other material averments, al-
leges that the death of the plaintiff's intestate was the
result of defects in the condition of defendant's ways,
works, machinery, etc., used in connection with its bus-
iness; that the incline railway was defective, the means
and appliances for stopping and preventing the car
from falling into the furnace were defective, and said
hoisting engine was defective. This count, it will be
observed, alleges several defects conjunctively, conse-
quently it was necessary to prove, or to introduce evi-
dence tending to prove, all of the defects. There was
not a particle of evidence that the engine was defective,
but it affirmatively appears that it was in good condi-
tion. It affirmatively appears by the plaintiff's own evi-
dence that the engineer, whose duty it was to operate
it and who was operating it on that day, could stop the
car at any time and at any place he pleased. Conse-
quently, it affirmatively appears that there was no de-
fect in the appliances for stopping said car. Nor did
the evidence show any defect whatever in the ways,
works, or machinery of this plant within the meaning
of the statute. It affirmatively and conclusively ap-
peared by the plaintiff's own evidence that this furnace
was not being operated at the time of the injury; that
the incline tramway and cars necessarily were not used
at the time for the purpose for which they were built
and intended, but for the incidental purpose of repair-
ing the furnace or relining it. The evidence affirma-
tively showed that the tramway, car, and device for op-
erating it were in good condition for the purpose of op-
erating the furnace—the purpose for which it was in-

tended. All the evidence showed that it was necessary to take up the rails of the tramway from across the top of the furnace in order to take out the bell and hopper preparatory to doing the repair work or relining the furnace. These rails were not put across the top of the furnace to keep the car from falling into the furnace, but it conclusively appears that they were put there for the purpose of running the car over the top of the furnace so that the contents of the car could be dumped into the furnace. It conclusively appears that the rails were not needed across the top of the furnace until it was ready to resume operations. This we think is perfectly obvious to any person. It is true that some of the witnesses said the rails could have been put back after the bell and hopper had been removed, and then again have been taken out when the bell and hopper were to be put back in the furnace, and then again replaced after the bell and hopper had been let down; it also appeared that if the rails had been across the top of the furnace the car would not have fallen. It was also testified by some of the witnesses that stop or chock blocks could have been put at the end of the tram lines and at the edge of the top of the furnace to prevent the cars from running into the furnace while it was open, but the evidence did not show that it was necessary or proper in relining the furnace or in the repair of it, but, on the other hand, to our minds it conclusively shows that they would have been obstructions rather than benefits in repairing the furnace as it was being repaired. This was affirmatively shown by the evidence of some of the witnesses, was not denied by any, and it would not be reasonable to suppose that they were necessary or proper in carrying on this repair work, but that they would be obstructions and hindrances. Consequently the failure to run a track across the top of the furnace

or to chock blocks or deadmen at the ends of the tram-
way at the top of the furnace cannot be said to have
constituted a defect in the ways, works, and machinery
within the meaning of the statute. We are not unmind-
ful of the evidence in this case that if this track had
been built across the top of the furnace or if the dead-
man or chock block had been erected as it was shown
that it could have been done, the injury would not have
happened; but this is far from showing that a failure
to do this constituted a defect in the ways, works, and
machinery of this plant, at this time and on this occa-
sion; but, on the other hand, it affirmatively shows that
their erection during the repair would have been an ob-
struction. The deadmen or chock blocks, or the track
across the top of the furnace, would without doubt have
prevented the injury, but their absence did not occasion
the injury; it merely constituted a condition upon
which another wrongful act operated to produce the in-
jury. The master cannot be held to have anticipated
this accident, nor can it be held to have provided
against it more than it did. If a strong net had been
stretched across the top of the furnace, this would have
prevented the injury; if the tram track had been taken
up clear to the ground, it would have prevented the in-
jury; if the plaintiff had provided an elevator, such as
is used in hotels, to carry its employes to the top of the
furnace, it might not have happened; but the absence
of these provisions certainly did not constitute action-
able negligence. As will be more fully shown hereafter
the wrongful act which caused the injury was that of
an intruder, some person who acted without right or
duty, and so far as this record shows, is unknown. It
was this act of this unknown person, in elevating the
car upon the incline, instead of stopping it where it
should and could have been easily stopped, avoiding the

injury, and then either negligently or intentionally run-
ning it to the middle of the furnace, and dumping it
and its contents to the bottom of the furnace below.
It is the law of this state, of England, and of other
states, and is well settled, that the duties of the master
to his servants who are engaged in preparing or collect-
ing material to construct or repair the ways, works,
or machinery of the plant, and putting it in suitable
condition for use for the carrying on of the master's
business, are not the same as the duties he owes to his
servants who are using such ways, works, machinery,
etc., after the construction or repairs are completed and
the business of the master is in operation; and that
servants who are engaged in this construction or re-
pair work of the plant of the master assume the risks
which are obviously incident to the work of construc-
tion or repair. They are not allowed to complain of the
ways, works or machinery as being defective, when that
defect is the very reason or the very cause of the serv-
ant's being there and at work, upon the occasion. The
duty which originally rests upon the master to furnish
safe ways, works, and machinery, for the time being
and for the purpose of construction or repair, is sus-
pended. It would be unreasonable to hold the master
to the same degree of strictness, while he is construct-
ing his plant or repairing the ways, works, or machin-
ery, as is required of him after he has constructed, or
after the repairs have been completed, and the plant is
in operation. If it were otherwise, the master could
not with safety repair or remedy a defect. Of course
this rule of law, like others, has its limitations. It is
not contended by the authorities on this subject, nor is
it attempted to be decided here, that the master is never
liable to the servant for an injury received while engag-
ed in repairing or remedying the ways, works, or ma-

chinery of the master, but it is decided that the same rules will not apply in the construction or repairing of the ways, works, or machinery that apply after the completion of repairs and during operation.—Labatt on Master and Servant, § 29 et seq.

The mere fact that the master has omitted to provide means to avoid injury does not make the master responsible in the absence of proof of negligence. In the absence of actionable negligence on the part of the master, an accident to the servant must be regarded as one of the hazards of the employment of which the servant takes the risk. When the master has done everything that the law requires of him to do to insure and maintain the safety of his servant, any risk which the employment otherwise involves is not assumed by him, nor should he be made liable therefor. The final question to be determined, in every case of an action by the servant against the master as such, is this: Was the master guilty of a breach of duty to the servant who brings the action? The duty of the master to his servant, arising from the contract of employment, is either express or implied, consequently the master's liability to his servant as such is limited to those obligations and those duties which arise under the contract and which he has either expressly or impliedly agreed to.—*Jones v. Granite Mills Co.,* 126 Mass. 84, 30 Am. Rep. 661; *Mensch v. Pa. Co.,* 150 Pa. 598, 25 Atl. 31, 17 L. R. A. 450; *Hough v. Texas Co.,* 100 U. S. 213, 25 L. Ed. 612; *Ford v. Fitzburg,* 110 Mass. 240, 14 Am. Rep. 598; *Farwell v. Boston Co.,* 4 Metc. (Mass.) 49, 38 Am. Dec. 339; *Harrison v. Central R. Co.,* 31 N. J. Law, 293. As was said by the learned Chief Justice Stone, of this court in *Mutch's Case,* 97 Ala. 196, 11 South. 895 (21 L. R. A. 316, 38 Am. St. Rep. 179): "To constitute actionable negligence there must be not only causal con-

nection between the negligence complained of and the injury suffered, but the connection must be by a natural and unbroken sequence without intervening efficient cause, so that, but for the negligence of the defendant, the injury would not have occurred. It must not only be the cause, but it must be the proximate cause; that is, the direct and immediate efficient cause of the injury."

We do not decide that any negligence on the part of the master was shown in this case, nor do we decide that there was an evidence tending to show that the master was guilty of any negligence, or that he was liable or answerable for the negligence of the party who committed the wrong which resulted in the injury. But we do decide that if it can be said that the master was guilty of actionable negligence, such negligence was not the proximate cause, it was not the direct and immediate efficient cause of the injury. As to this proposition, we do not think there can be a doubt. In *Mutch's Case* it was conceded by the court that the railroad company was guilty of negligence in running the train at a greater rate of speed than was provided by law, but the plaintiff, who was a boy 12 or 14 years of age, of average intelligence, attempted to climb the ladder of a freight car and was injured. Judge Stone held that in that case the negligence of the railroad company was not the proximate cause of the injury. Then much more so must it be in this case, when it indisputably appears that the direct cause of this injury was the negligent or wrongful act of some person running the car up the incline and dumping plaintiff's intestate into the furnace. It affirmatively appeared by the plaintiff's own evidence that the defendant did not do it, and that no agent of defendant, authorized to act for it, did it, but it affirmatively appeared from the plaintiff's own evi-

dence that it was done by an unknown intruder, interloper, or intermeddler, against whose wrongful acts the defendant company could not be held to have provided. It is true, as we have said above, that if the chock blocks had been at the end of the track, or if the track had extended across the top of the furnace, the injury would not have resulted, and the master could have provided the chock blocks and could have extended the tracks across the furnace, and, if this had been done, the injury would not have resulted, yet his failure to do this was not and could not be held to be actionable negligence. The injury was the saddest and most deplorable that could have happened, but the facts do not show that the master can be held liable. He could not have anticipated it, nor could he reasonably have been expected to provide against it. If the master had had no furnace, if he had never employed plaintiff's intestate, if he had taken down the tramway to the ground, if he had not fired up the engine on the morning of the accident, if he had put a net across the top of the furnace while it was being repaired, the sad and deplorable accident would not have happened, but certainly his failure to do any one of these does not and should not make him liable.

A wrongful act of independent third persons (it conclusively appears that this was such, though they may have been the servants of the master), not actually intended or reasonably to be expected by the master, is not the consequence of the master's wrong, and he is not bound to anticipate the general probability of such acts.—*Burt v. Advertiser Co.*, 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97. The act of the person in elevating the car upon the incline and dumping it into the furnace, which unquestionably resulted in the injury complained of, was a trespass upon the rights of the de-

fendant as well as those of the plaintiff, though it may have been the act of the master's servant. The master could not foresee or reasonably anticipate, and he was not required to anticipate or to provide for, violations of the law of trespass upon his property, by other persons or by his own servants. They were not employed by him for this purpose, and were not authorized to perform it. They were not shown to be incompetent for the purposes and work for which they were employed. It is true that the master is liable in damages for an injury negligently or intentionally inflicted by his servants upon others, third persons, or upon other servants in certain cases, but in order for him to be liable the negligent or wrongful act of the servant must be within the scope or line of employment, and the master may sometimes be liable, though the wrongful act was done by his servants in express disobedience to the master's order, but he is not liable unless the act was within the line or scope of employment. In some degree the same rule holds as with principal and agent. The rule has been clearly expressed by our court as follows: "If the employe, while acting within the line and scope of the employment, do an act injurious to another, either through negligence, wantonness, or intention, then for such abuse of authority conferred upon him or implied in his employment, the master or employer is responsible in damages to the person thus injured. But if the servant or agent go beyond the range of his employment or duties, and of his own will do an unlawful act, injurious to another, the agent is liable, but the master is not."—*Gilliam v. R. R. Co.,* 70 Ala. 268; *Goodloe v. Memphis Co.,* 107 Ala. 233, 18 South. 166, 29 L. R. A. 729, 54 Am. St. Rep. 67.

It conclusively appears from the evidence in this case that whoever pulled the lever and propelled the car and

dumped it into the furnace, the cause of the injury, did so without right or authority from the defendant company; and if it was done by one of the defendant's servants or agents, it affirmatively appears from the plaintiff's own evidence that it was not within the line or scope of the employment, and for this reason the defendant could not be liable to the plaintiff for the death of the intestate who was another servant. That is to say, it conclusively appears that the wronful act, the cause of the injury, was not the result of any actionable negligence or intentional wrong on the part of the defendant or of any agent or servant of it, acting within the line or scope of his employment, without which there could be no liability on the part of the defendant.

The second count of the complaint, among other things, charges that the death of the intestate was caused by the failure of the defendant to provide a careful and competent engineer, and its negligence in allowing said engine to be operated by said incompetent negro boy Jim Doolittle. The evidence not only fails to prove this allegation, but the plaintiff's own evidence affirmativley disproves it.

The fifth count charges that the defendant, by its servants who were making such repairs on said furnace did recklessly, wilfully, and wantonly dump said deceased into said furnace and kill him. It certainly cannot be contended that there was any evidence to prove this count of the complaint. There was certainly no proof of the defendant's actual participation in this wrongful act as alleged, and there was no evidence to show that it authorized or ratified the wrongful act, but it affirmatively appears by the plaintiff's own witness that the defendant had no knowledge of the fact that it was or could be done.

This disposes also of the sixth count for the same reasons, and what has been said of the first and fifth counts disposes of the seventh count.

The eighth count contained an allegation that intestate was killed by reason of the negligence of a person to whose order or directions he was then and there bound to conform and did conform. There was no direct evidence, nor any from which an inference could well be drawn that any orders or directions had been given to the intestate, or that he was conforming to any orders or directions when he was killed.

As we have stated above, it did not appear that any order or direction whatever was given to him upon this occasion; but if it could be said, as contended by counsel for appellant, that the direction or order from McLaughlin or the negro Brooks to bring the articles to him, it certainly cannot be contended that this was a negligent order, or that he was guilty of any negligence in giving it, and the plaintiff proved by the witness Mylam himself that he had charge and control of the hoisting engine, and of the tramway at the time, and the plaintiff proved by him conclusively that there was no negligence on his part as was alleged in the ninth count of the complaint. It conclusively appears from the evidence that the negligence was not on the part of a person who had charge or control of that hoisting engine, but was the result of the negligence or intentional wrongful act of a person who meddled with the engine, but who did not have charge or control of it, nor any duty to perform in connection with it.

As to the allegations in the tenth count of the complaint, that the defendant negligently and carelessly allowed Jim Doolittle, an ignorant, incompetent, and inexperienced negro boy, to take charge of the hoisting engine, and that he negligently and carelessly hoisted

the car to the top of the furnace, and also as to the averment that the death of the intestate was caused by one Kiser, the defendant's general manager, in intrusting Doolittle with charge or control of the hoisting engine, they are absolutely unsupported by the testimony, in fact the plaintiff's witness affirmatively proved the contrary.

As to the eleventh count, which contained an averment that it was caused by reason of the act or omission of a person in the employ of defendant, in obedience to the rules and regulations or by-laws of the defendant, and in obedience to instructions given by a person delegated by the authority of the defendant in that behalf, in that he allowed Jim Doolittle, an incapable negro boy, to have control of the hoisting engine, the evidence does not show that Doolittle had charge or control of the hoisting engine, but affirmatively shows that he did not have charge or control of it, and it affirmatively appears that if he did handle it at the time he did so without authority, express or implied, and without the knowledge or consent of the defendant or any one authorized to consent to it; and if all this could be said to be otherwise, it is beyond question that it was not in pursuance of any rules, regulations, by-laws, or instructions.

As to the twelfth count, which, among other things, claimed that the death was the result of the negligence of a person who had superintendence intrusted to him, while in the exercise of the superintendence, in that the engine was left unattended by any one capable of properly controlling it, it is not supported by the evidence. The plaintiff proved by the witness Mylam, who was intrusted with the care and management of it, that he was there present all the while, and that he was within a few feet of the engine when the accident happened;

and that there was nothing to show that it was negligence on his part to be a few feet away from the lever. It was proven by him himself that the operation of this engine was not the only duty enjoined upon him; that he was the only one authorized to operate it; and that he was not required to operate it very much while the furnace was in process of construction, and that he was engaged in doing other duties at the very time; and it certainly could not be said to be culpable negligence of his allowing the negroes to go into the doghouse to warm on the occasion, and he certainly had no right to anticipate that they would meddle with the lever in there, or attempt to usurp his authority in his very presence. Certainly the employer is not called upon to anticipate meddling with instrumentalities, though they be dangerous ones, by grown people and those who know of their dangerous uses and purposes.

As to the allegation of the fifteenth count, that the injury was the result of the act of a person whose name and particular office are unknown and who was entrusted with superintendence while in the exercise of it, in negligently causing plaintiff's intestate to be carried upon the car when it was highly dangerous to his life, it is not supported by any evidence, but the contrary is affirmatively proven by plaintiff's own evidence. It appeared from all the evidence (and it must be remembered that all the evidence in this case was that of plaintiff's own witnesses) that the intestate rode upon the car as a matter of his own choice and convenience. There was no evidence to show or tending to show that he was invited, ordered, or directed so to do. It does not appear that any witness had seen him before the accident. It also affirmatively appeared, without contradiction, that there was a stairway leading up from the ground to the top of the furnace, parallel with the incline tram-

way, by which the intestate could have made the trip if he had desired; that it was built for the very purpose of persons ascending and descending; that it was at the time in a perfectly safe condition, unobstructed, and that he chose the route by the car rather than the other which was safe and open to him.

As has been said before in reference to the fifth and sixth counts, there is no evidence whatever to support the averments of willfulness or wantonness on the part of the defendant or any of its agents for whose acts it was responsible.

What has been said above with reference to the first and second counts disposes of the third count, and what we have said with reference to the first count disposes of the fourth count, and what has been said of the other counts when specifically mentioned disposes of all the counts of the complaint.

If the propositions of law are correct, the evidence not only failed to support all the material averments of any one count, but it affirmatively disproves one or more material averments of every count of the complaint. This being true, the general affirmative charge should have been given for the defendant as requested, and if there be error in the way or manner in which it was given, or in other instructions to the jury, it of necessity was without injury to the plaintiff.

It is proper for us to say that we have not ignored the fact that evidence was excluded by the court against the objection of plaintiff, as to which he assigns error, and we have considered the case thus far as if all those rulings had been made in favor of the plaintiff; that is to say, if the evidence had been introduced, which he desired to introduce, but which was not allowed, and if that had been excluded which he desired to be excluded, but which was not allowed, the plaintiff would still not have

been entitled to recover for the same reason—that is to say, it would not have overcome the difficulties. In fact, the evidence which he sought to introduce in several instances was subsequently allowed; that is to say, that it was dangerous to ride upon the car in the condition and under the circumstances under which plaintiff's intestate rode.

Injuries to servants from the negligence of fellow servants, not within the line or scope of the employment or within the provisions of the employer's liability act, do not render the master liable for such act. As was said by Chief Justice Brickell in the case of *Smoot v. M. & M. Ry. Co.*, 67 Ala. 17, from which we have already quoted: "The reason for relieving the master from liability for such injuries is founded in the policy of encouraging and compelling servants to exercise diligence and caution in the discharge of their duties, and which, while protecting him, affords protection also to the master." It is true that this case was decided before the employer's liability act, but the rule and proposition are true except as to cases taken without the rule by authority by the provisions of the employer's liability act.

It is true that when the evidence is conflicting the jury should be left to find the facts without interference by the court, and if there is any evidence tending to prove a fact, no matter how slight, the court has no right to take such question from the consideration of the jury. It is the province of the jury and not of the court to find from the evidence the truth of a disputed fact. It is also well settled that in jury trials it is the exclusive province of the court to determine all questions of law arising in the case, and it is likewise the exclusive province of the jury to determine the facts under proper instructions from the court. The line be-

tween the duties of the court and those of the jury should be observed. It is of the greatest importance to the administration of justice that each should be made responsible for its appropriate department, for in this way only can errors of law be traced to their proper source.—*State v. Smith*, 6 R. I. 34.

Under our system of laws and the practice prevailing in our court for nearly 100 years, the power is vested in the court to determine whether the evidence offered tends to support the allegations of the party. The right should be cautiously exercised, but in some cases it is the duty of the court to direct a verdict when thereunto requested in writing, and a failure so to do will be error, for it is not only the right, but the duty, of the court. When the plaintiff has introduced his evidence, and it does not tend to prove the plaintiff's cause of action, the court may refuse to hear evidence offered by the defendant, and, if properly requested, direct the jury to find against the plaintiff, but it is only in the absence of all evidence against the defendant that the court should direct a verdict in his favor. And it is always error and not within the discretion of the court to leave a question to the jury in respect of which there is no evidence. If there is none to support the theory of fact assumed, the court should not let the case go to the jury; likewise, when the facts in the case are undisputed and the evidence, with all the inferences which the jury can rightfully draw from it, does not as a matter of law have any tendency to establish the proposition which is essential to the maintenance of the action, it is the duty of the judge, if properly requested, to instruct the jury; but if there be any evidence which tends to establish the plaintiff's cause, it is error for the court to withdraw the case from the jury or to direct a verdict; because it is not for the court to judge of the suffi-

[Tobler v. Pioneer Mining & Mfg. Co.]

ciency of the evidence. But the affirmative charge should not be given when the evidence is conflicting as to any material question necessary for the verdict, or when the evidence is circumstantial, or when a material fact rests wholly in inference; but it may be given, and should on request be given, whenever the court would sustain a demurrer to the evidence interposed by the party requesting the instruction.—*Smoot v. M. & M. Ry. Co.,* 67 Ala. 17; *Tabler v. Sheffield Co.,* 87 Ala. 309, 6 South. 196.

Applying these propositions of law above stated to the evidence in this case, a verdict should not have been allowed against the defendant, for the reason that there was an entire failure of proof as to each count of the complaint. Some of the material averments in each count of the complaint were expressly disproved by the evidence of the plaintiff. There was no conflict as to any material fact which was necessary to the defense; there could be no reversible error because there could be no injury done the plaintiff by the direction of a verdict for the defendant.

The case is affirmed.

Affirmed.

SIMPSON, ANDERSON, and EVANS, JJ., concur. MC-CLELLAN and SAYRE, JJ., dissent; the former being of the opinion that the court erred in giving the general affirmative charge.