# Western Union Telegraph Co. *v.* Jones.

### Damage from Electricity.

(Decided November 30, 1916.   73 South. 470.)

**Electricity; Evidence; Jury Question.**—Under the evidence in this case it was a question for the jury whether the light wire, alleged to have caused the death of plaintiff's intestate, broke from coming in contact with the pole and thereby caused the death.

APPEAL from Madison Circuit Court.

Heard before Hon. ROBERT C. BRICKELL.

Action by Geraldine Jones, as administratrix, etc., against the Western Union Telegraph Company.   From judgment for plaintiff, defendant appeals.   Affirmed.

This was an action for death of plaintiff's intestate from contact with a light and power company's wire; the negligence charged to defendant telegraph company by the second count of the complaint being that it knowingly maintained a pole in such proximity to the wire that the wire could come in contact with the pole by mere vibration, causing the wire to break and fall into the street.

FORNEY JOHNSTON, W. R. C. COCKE, and COOPER & COOPER, for appellant.   BOULDIN & WIMBERLY, and DOUGLASS TAYLOR, for appellee.

THOMAS, J.—This is the second appeal in this case.   In the opinion on the first appeal (*Western Union Telegraph Co. v.*

*Jones,* 190 Ala. 70, 77, 66 South. 691, 694), this court said: "There was evidence tending to show that the dangerous wire was in contact with one of the defendant's poles, and that, if the pole was very wet, it might, by this contact, fuse the wire and cause the injury complained of. So there was some evidence to support the second count, and the court properly refused the defendant's requested affirmative instruction as to this count."

Did the lower court err in refusing to give the affirmative charge for the defendant? And did it err in refusing to grant appellant's motion for a new trial on the ground that the verdict of the jury was contrary to the weight of the evidence? These are the questions presented on this appeal.

On the trial, John Williams, a witness for the plaintiff, testified that when he learned that Mr. Schuyler Jones was killed, witness went down there where deceased was, and found him lying on his face, on the sidewalk, with a wire right under his breast; that that telegraph pole went up between the wires of the light company; that the light wire that fell was swinging very close to that telegraph pole; that witness did not think that it was over six or eight inches from the pole; that he knew it to be a fact that the wire that fell, that light wire, in rainy weather. would vibrate against and cause "arcing and flashing" with the pole; that he had seen that, had seen it plainly but a short time before this accident, that "it looked like the place was afire;" that witness was a couple of hundred yards from it; that it lighted up the darkness and the buildings around there, "made a right smart little light;" that witness noticed it and thought it was a warehouse on fire, then on investigation found that it was this wire; that on windy damp weather, this arcing and flashing would show that light; that there was a considerable little notch on the side of the people where the wire had struck and burned it, that it showed a charred effect; that there was a notch on that pole about as wide as your hand and about half that deep burned into the pole; that witness had noticed this burning about 20 or 30 days before deceased was killed.

John McClure, a witness for the plaintiff, testified to the effect that at the time of Mr. Jones' death witness was connected with the light company, as superintendent; that he was acquainted with the wires on Jefferson street; that they carried about 2,300 volts; that it would be dangerous for a man to come in contact with them; that they would cause his death; that the telegraph

poles run between these wires; that witness had seen such a wire as this, charged with the voltage that this wire carried, burn in two when the end of it came in contact with the wet ground; that it will get very soft after the insulation is burned off; that witness had seen it as limp as a rag; had seen it burn in two, in three or four places. Witness further testified that Jones was killed on a stormy, rainy night.

Witness Baugh testified for the plaintiff that he had noticed sparking in the daytime and at night during rainy weather, sparking at this pole; that he observed a notch or charred or burned place on the pole, up where the wire was swinging against it; that he had noticed this quite awhile ago.

Professor A. C. Dunstane, a witness for the plaintiff, testified that he was an electrical engineer, was Professor of Electrical Engineering at the Alabama Polytechnic Institute at Auburn for 16 years, had been a student at a number of colleges, and had been engaged in the study of electrical engineering about 25 years. This witness was asked the following hypothetical question: "Q. If an electrical light wire, say a No. 8 copper wire, carrying a current sufficient for electric lighting purposes, say approximately 2,000 volts and up, strung alone and above a public street, and resting or vibrating against a cedar pole set in the ground, and, if, as a matter of fact, during rainy weather when this pole is wet, flashes and flames are seen at the point of contact with this pole, and the pole at the point of contact shows a notch, charred effect, state, first, what is the cause of this arcing and flashing and spitting of the pole; and, second, state what is the effect upon the wire. State fully."

To which witness answered:

"I will say when the wire swings clear of the pole, the attempt of the current to flow in spite of the gap causes an arc, thus resulting in the flashing and spitting of the pole and wire."

That the effect of the arcing upon the wire would be, that each spark or flash will evaporize a portion of the copper forming the wire, and this process, going on for a long time, will reduce the amount of material in the wire at or near the point of contact with the pole. That in witness' opinion this constant evaporization of the material of the wire will result in its weakening. That the weakening of the wire, if continued long enough, will result finally in the parting of the wire. That in his opinion such

[Cardwell v. Virginia State Insurance Company, et al.]

a wire is exceedingly dangerous, and is certain to part sooner or later.

Witness Knowlen, for the defendant, testified that he examined the guy wire when it was clipped from the pole and fell to the ground after the accident; that if the light wire had come in contact with the guy wire, the guy wire would have shown spitting or blisters, and that there was no such spitting on the guy wire.

Considered in the light of all the testimony in the case, it was a question for the jury to decide whether or not the light wire broke as the result of coming in contact with this telegraph pole. —*Amerson v. Corona Coal & Iron Co.*, 194 Ala. 175, 69 South. 601; *Tobler v. Pioneer, etc., Co.*, 166 Ala. 517, 52 South. 86. The testimony tended to eliminate other causes for the breaking of this wire.—*Miller-Brent Lumber Co. v. Douglas*, 167 Ala. 286, 52 South. 414; *Tinney v. Vent. of Ga. Ry. Co.*, 129 Ala. 523, 30 South. 623; *Amer. Cast Iron Pipe Co. v. Landrum*, 183 Ala. 132, 62 South. 757; *Carlisle v. Cent. of Ga. Ry. Co.*, 183 Ala. 195, 62 South. 759; *Patton v. Tex. Pac. R. Co.*, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361. The weight of the testimony leads to the conclusion that there was a causal connection between the contact of the light wire with the telegraph pole, and the death of plaintiff's intestate. This was the conclusion reached by the jury.

There being no error in the record, the judgment of the trial court is affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.